IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA        )
                                )
v.                              )  CRIMINAL ACTION NO. 05-53 (GBL)
                                )
AHMED OMAR ABU ALI,             )
                                )
          Defendant.            )
                                )
                                )

**MEMORANDUM OPINION**

THIS MATTER is before the Court on the Defendant Ahmed Omar Abu Ali's Motion to Suppress and Motion to Dismiss.

The defendant, Mr. Ahmed Omar Abu Ali, is charged under various statutes that preclude a citizen from rendering, or conspiring to render, assistance or support to a designated foreign terrorist organization.  Mr. Abu Ali is charged with joining Al-Qaeda and participating in a plan to carry out terrorist activities within the United States, including a conspiracy to assassinate the President of the United States.[1]

---

[1] The defendant, Mr. Abu Ali, is charged with the following offenses: Conspiracy to Provide Material Support and Resources to a Designated Foreign Terrorist Organization (Al-Qaeda), 18 U.S.C. § 2339B (Count 1); Providing Material Support and Resources to a Designated Foreign Terrorist Organization (Al-Qaeda), 18 U.S.C. § 2339B (Count 2); Conspiracy to Provide Material Support to Terrorists, 18 U.S.C. § 2339A (Count 3); Providing Material Support to Terrorists, 18 U.S.C. § 2339A (Count 4); Contribution of Services to Al-Qaeda, 50 U.S.C. § 1705(b); 31 C.F.R. § 595.204 (Count 5); Receipt of Funds and Services from Al-Qaeda, 50 U.S.C. § 1705(b); 31 C.F.R. § 595.204 (Count 6); Conspiracy to Assassinate the President, 18 U.S.C. § 1751 (Count 7); Conspiracy to Commit Aircraft Piracy, 49 U.S.C. § 46502(a)(2) (Count 8); and Conspiracy to Destroy Aircraft, 18 U.S.C. § 32(b)(4) (Count 9).

Mr. Abu Ali was arrested on June 8, 2003, in Saudi Arabia by the Saudi government in connection with an investigation of the Riyadh bombings that occurred in May, 2003.  In his Motion to Suppress, Mr. Abu Ali asserts two principal arguments.  First, he alleges that he was tortured while in Saudi custody and that the statements he allegedly made in detention are, therefore, involuntary and must be suppressed.  Second, Mr. Abu Ali contends that the United States and the Saudi Government acted as partners or "joint venturers" in his arrest and lengthy detention in Saudi Arabia.  He also argues that the Saudi government's search of his dormitory room in Medina and the search of his residence in Falls Church, Virginia, violated his Fourth Amendment rights against unreasonable searches and seizures.  In his Motion to Dismiss, Mr. Abu Ali contends that because his arrest and lengthy detention were at the direction of the United States Government using the Saudi Arabia Government as a partner, joint venturer, or surrogate, the Indictment must be dismissed because the delay in his prosecution violates the Speedy Trial Act and his Sixth Amendment right to speedy trial.

The issues presented by these motions are set forth below. The defendant's motions are all denied because the Court, after having heard nearly fourteen days of testimony, is persuaded that the government has met its burden of proving that Mr. Abu Ali's statements were voluntary, and that the alleged defects in the aforementioned searches and Indictment do not violate Mr. Abu

Ali's rights under the Fourth or Sixth Amendments.

With regard to the defendant's Motion to Suppress, the issues before the Court are:  (1) whether any incriminating statements allegedly made by the defendant during his time in Saudi Arabia were made "involuntarily" as a result of "gross abuse" and "inherently coercive conditions" and are therefore inadmissible under the Due Process Clause of the Fifth Amendment; (2) whether any incriminating statements allegedly made by the defendant were obtained by U.S. and Saudi officials in a manner that "shocks the conscience" of the Court and are therefore inadmissible under the Due Process Clause of the Fifth Amendment; (3) whether any incriminating statements allegedly made by the defendant during his time in Saudi Arabia were obtained through custodial interrogations either (a) by United States and Saudi officials acting together in a "joint venture" or (b) by Saudi officials acting as "agents" of the United States, and are therefore inadmissible because the defendant was not afforded his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966); (4) whether the search of the defendant's dorm room in Medina, Saudi Arabia, conducted by Saudi officials was unlawful because it lacked probable cause and therefore any evidence seized in that search should be suppressed; (5) whether the search of the defendant's home in Falls Church, Virginia, was authorized pursuant to information obtained from an unlawful interrogation of the defendant and therefore any evidence seized in that search should

be suppressed.

The Court denies the defendant's Motion to Suppress because it finds:  (1) that the government has demonstrated by a "preponderance of the evidence" that any incriminating statements allegedly made by the defendant were "voluntary" and not the result of "gross abuse" or "inherently coercive conditions" and therefore that the statements are admissible evidence for trial; (2) that neither the conduct U.S. nor Saudi law enforcement officials in the arrest, detention, or interrogation of the defendant "shocks the conscience" of the Court; (3) that (a) U.S. law enforcement officials did not act in a "joint venture" with Saudi officials in the arrest, detention, or interrogation of the defendant and (b) Saudi law enforcement officials did not act as agents of U.S. law enforcement officials, and therefore *Miranda* warnings were not required; (4) that Saudi law enforcement officials did not act in a "joint venture" with U.S. law enforcement officials when conducting their search of the defendant's dorm room in Medina, Saudi Arabia, and therefore that the Fourth Amendment is inapplicable to that search; (5) that there is no evidence that the warrant underlying the search of the defendant's home was unlawful or lacked probable cause.

With regard to the defendant's Motion to Dismiss, the issues before the Court are:  (1) whether the conduct of United States and/or Saudi law enforcement officials in the detention and interrogation of the defendant "shocks the conscience" of the

Court in violation of the Due Process Clause of the Fifth Amendment and thus requires the Court to divest itself of jurisdiction and dismiss the Indictment; (2) whether the current prosecution of the defendant, following his two-year detention in Saudi Arabia, violates the Speedy Trial Act, 18 U.S.C. § 3161(b) (2000), and therefore requires dismissal of the Superseding Indictment; (3) whether the current prosecution of the defendant, following his two-year detention in Saudi Arabia, violates the defendant's Sixth Amendment right to a speedy, public trial and therefore requires dismissal of the Superseding Indictment; (4) whether the current prosecution of the defendant is a "presumptively vindictive response" to the habeas corpus petition filed by his parents on July 28, 2004, and therefore violates the defendant's due process rights under the Fifth Amendment.

The Court denies the defendant's Motion to Dismiss because it finds:  (1) that neither the conduct of U.S. nor Saudi law enforcement officials in the arrest, detention, or interrogation of the defendant "shocks the conscience" of the Court; (2) that the government complied with the Speedy Trial Act because the criminal Indictment against the defendant was filed prior to his being taken into federal custody on federal charges, and therefore was filed within thirty (30) days of his arrest on federal charges as required by the statute; (3) that the Sixth Amendment right to speedy trial does not attach until the defendant has been indicted or arrested, and the defendant has

-5-

not been prejudiced by any pretrial delay since the time of his indictment on federal charges on February 3, 2005, and his subsequent arrest on February 21, 2005; (4) the current prosecution is within the prosecutorial discretion of the government and the defendant has not advanced sufficient evidence to establish prosecutorial vindictiveness on the part of the government.

For the foregoing reasons, the Court denies the defendant's Motion to Suppress and Motion to Dismiss.

## I. BACKGROUND

### A.   Statement of the Case

On June 8, 2003, the defendant, Mr. Ahmed Omar Abu Ali, who is an American citizen from Falls Church, Virginia, was arrested in Medina, Saudi Arabia, based on information obtained by Saudi law enforcement officials that he was a suspected member of the al-Faq'asi terrorist cell located in Saudi Arabia.  The defendant, who at the time was a student in Saudi Arabia, was held in Medina by the Saudi national security police, known as "the Mabahith," for several days, and his dorm room in Medina was searched by Saudi law enforcement officials.  Following his detention in Medina, Mr. Abu Ali was transported to a Saudi detention facility in Riyadh, Saudi Arabia.

While at the facility in Riyadh, the defendant, upon interrogation by Saudi officials, allegedly made a number of

-6-

incriminating statements regarding his involvement with a number of terrorist plots.  The Mabahith agreed to a U.S. government request to allow the Federal Bureau of Investigation ("FBI") and the U.S. Secret Service ("Secret Service") to provide questions for the defendant and to observe an interrogation of him through a two-way mirror.  On June 15, 2003, FBI officials observed the defendant when he was interrogated yet again by Saudi law enforcement officials and allegedly made more incriminating statements and admissions.  On July 18, 2003, the defendant allegedly made out a handwritten confession which he was videotaped reading on July 24, 2003.

In September 2003, the FBI interrogated the defendant without giving him *Miranda* warnings.  Although Mr. Abu Ali allegedly made incriminating statements during the course of those interrogations, the government has indicated that it does not plan to use any statements obtained from those interrogations in its case-in-chief.

The defendant, through his Motion to Suppress and Motion to Dismiss, moves the Court to exclude all of the incriminating statements allegedly made by him because he alleges, among other things, that he was (1) tortured by Saudi officials to elicit those statements and (2) denied his constitutional rights under *Miranda*.

Among his allegations of torture, the defendant maintains that Saudi officials:  (1) "whipped" him on his back; (2) slapped

-7-

him in the face and pulled on his beard, ears, and hair; (3)
kicked him in the stomach; (4) subjected him to sensory
deprivation by placing him in a cell that was fully and
continually lit and by interrogating him an excessive number of
times, typically beginning late at night and continuing into the
following morning; (5) chained him to the ground so that he was
forced to stay in a crouching position; and (6) chained him with
his hands above his head for a long period of time.

**B.    Findings of Fact and Conclusions of Law in Support of the
        Court's Rulings**

In ruling upon the Motion to Suppress and the Motion to
Dismiss, the Court is called upon to review all of the evidence
presented in the case, including witness testimony, and to make
findings of fact and conclusions of law concerning a number of
issues.  In this case, the Court must make a primary
determination as to whether the incriminating statements
allegedly made by the defendant were made "voluntarily" and
therefore whether those statements will be admissible evidence at
trial.

The Court makes the following findings of fact and
conclusions of law after having had an opportunity to consider
the witnesses' testimony, consider their demeanor on the stand,
and observe the contrasts in their demeanor and the consistencies
and inconsistencies in their testimony.  The Court will not

-8-

summarize in detail all of the various witnesses' testimony in this Opinion.  Instead, the Court will make a general review of the facts pertinent to the Motion to Suppress and the Motion to Dismiss.

### 1. The Government's Evidence Surrounding the Defendant's Arrest and Detention.

Prior to the suppression hearing, the Court heard seven (7) days of live testimony from several Saudi government officials who were involved in the arrest and detention of Mr. Abu Ali. The witnesses appeared via satellite realtime video and audio transmission from Saudi Arabia to the federal courthouse in Alexandria pursuant to Federal Rule of Criminal Procedure 15 and a protective order.  For security reasons, the witnesses were permitted to testify under oath via pseudonyms on a split screen television set up where they could be observed and heard by the defendant, his counsel, and prosecutors in Alexandria, Virginia. The court reporter in Alexandria made a realtime transcription of the testimony.  Simultaneously, defense counsel, prosecutors, and an Arabic translator were present with the witnesses in Saudi Arabia.

First, the Saudi government officials (hereinafter "Government officials") testified that two compounds in Riyadh were bombed, killing thirty-nine (39) people, including nine (9) Americans.  The Government officials investigated this terrorist

incident and developed a list of the nineteen (19) "most wanted" individuals alleged to be associated with the bombing and the terrorist group Al-Qaeda.  Government officials reported that a detained suspect whom they had questioned identified "Reda" as a member of the Al-Qaeda cell who remained at large.  This suspect later identified a photograph of Mr. Abu Ali from a Medina University student photo book.  The suspect said that "Reda" was a student at the Islamic University and was an American or European citizen of Arabian background.  He stated that "Reda" was either Syrian or Jordanian.

Government officials then received an order to arrest "Reda," and they went to the Islamic University and met with university officials to locate "Reda."  The Government officials' order was to arrest "Reda" and to search him and his belongings. Later a written order was issued.  The Arresting Officer testified that his orders did not include interrogating the suspect.  Rather, he was only to arrest, search, detain, and send "Reda" to Riyadh for interrogation.

The Arresting Officer went to Mr. Abu Ali's classroom after being directed there by the school registrar.  The Arresting Officer said he did not go inside the classroom.  He asked a university official to ask Mr. Abu Ali to come outside the classroom building.  Mr. Abu Ali exited the classroom building where seven government officers were present.  The government officers were not wearing police uniforms nor displaying weapons. The Arresting Officer testified that he told Mr. Abu Ali that the

officers had a subject they wanted to talk to him about.  The
Arresting Officer put his hand on Mr. Abu Ali and escorted him to
the waiting police cars.  Mr. Abu Ali was handcuffed as he got
into the car.  Mr. Abu Ali rode in the backseat of a car between
two officers.  Mr. Abu Ali was taken to his dormitory room where
his belongings were gathered up.  Mr. Abu Ali was not mistreated
in the car.

At Mr. Abu Ali's dormitory room, the Government officials
searched the room and gathered his belongings.  Mr. Abu Ali was
present and pointed out his belongings to the Government
officials.  Ex. 27 at 87 (July 11, 2005 hearing).  The Arresting
Officer testified that it is customary in Saudi Arabia to search
a suspect's residence when the suspect is taken in for
questioning.  Mr. Abu Ali was then transported to the Medina
field office detention center.  The Arresting Officer denies
using or observing anyone else using physical force of any kind
against Mr. Abu Ali.  The Arresting Officer denied having any
orders to beat Mr. Abu Ali, to whip him, or to apply any physical
force to him.  The Arresting Officer testified that they have
orders not to use force against suspects, but to treat them with
respect.  He reported that Mr. Abu Ali was treated with respect
and that Mr. Abu Ali did not resist and was respectful.  Mr. Abu
Ali's testimony on his treatment up to the time he arrived at the
Medina facility is consistent with the testimony of the Arresting
Officer.

The Arresting Officer was specifically questioned about

-11-

whether the United States government provided his government with
information about "Reda" or Mr. Abu Ali, or if the United States
government or law enforcement was involved in supplying
information to arrest Mr. Abu Ali, and the Arresting Officer said
"no."  None of the Saudi government officials or the FBI agents
who testified offered evidence that the United States was
involved in the Saudi government's decision to arrest and to
detain Mr. Abu Ali.

### 2. Mr. Abu Ali'S Detention in Medina, Saudi Arabia.

The Lieutenant Colonel-Warden ("Lieutenant Colonel,"
"Warden") of the Medina facility where Mr. Abu Ali was detained
adamantly denied that Mr. Abu Ali was tortured, beaten, deprived
of sleep, or questioned in Medina. He stated that the Government
has a policy against torture and physical abuse of prisoners or
suspects, and that the policy is enforced.  He denied that Mr.
Abu Ali was abused at the Medina detention facility.

The Warden described the detention facility as a residential
type building.  Each cell has a bed, mattress, blanket, pillow,
prayer rug, and a Koran.  The Warden testified that for the first
two days or so, lights are kept on at all times and there are
cameras in each room so the guards can observe the prisoners.
There are no tapes of Mr. Abu Ali's stay because the tapes are
routinely recorded over.  Three meals are provided each day, and
prisoners can select from several meal choices.  Because there is
no kitchen in the building, the prison has to send out for food

for the facility.

### 3. Saudi Officials Deny that Mr. Abu Ali was Interrogated in Medina, Saudi Arabia.

The Lieutenant Colonel testified that he was not ordered to question Mr. Abu Ali and that neither he nor anyone on his staff interrogated Mr. Abu Ali in Medina.  He stated that when he first observed Mr. Abu Ali two hours after he had entered the prison, he did not see any bruises or signs that Mr. Abu Ali was in distress.  The Lieutenant Colonel's testimony held up under cross-examination, and the Court finds no reason to discredit his testimony.

### 4. Mr. Abu Ali's Detention in Riyadh, Saudi Arabia.

Mr. Abu Ali was transported to the Riyadh prison, and the statements in controversy in the instant Motions were allegedly made by him there on June 11, 12, 15, and July 24, 2003.

The Brigadier General and the Captain of the prison testified about their contact with Mr. Abu Ali in Riyadh.  The Brigadier General and the Captain were Mr. Abu Ali's principal interrogators in Riyadh.  The sum and substance of the Brigadier General and the Captain's testimony coincide in several material respects.

First, the Brigadier General and the Captain were questioned extensively by both sides concerning Mr. Abu Ali's claims that he

was tortured, beaten, deprived of sleep, food, water, denied use of a bathroom or a mattress, and use of other facilities in Medina or Riyadh in order to secure statements.  Each adamantly denies that they directed, participated in, or were aware of any government official torturing Mr. Abu Ali or engaging in any such behavior.

Second, the Brigadier General and the Captain deny that the United States government had any role in the arrest and detention of Mr. Abu Ali.  As far as they know, the Saudi investigation and roundup of the nineteen individuals most wanted in connection with the Riyadh bombings produced information that led to Mr. Abu Ali's arrest.  They admit that in June 2003, they were ordered to conduct some questioning of Mr. Abu Ali so the FBI could observe Mr. Abu Ali and to receive some questions from the FBI to ask of Mr. Abu Ali.

Third, the Brigadier General and the Captain testified that when they met with Mr. Abu Ali on the first night, he appeared to be tense and anxious about being arrested.  Mr. Abu Ali told them he feared that the Saudis would turn him over to the United States government.  Each officer testified that they tried to assure Mr. Abu Ali that their investigation only concerned the Riyadh bombings and the Al-Qaeda cell which was operating in Saudi Arabia.

The Brigadier General testified that upon the defendant's arrival in Riyadh, he was kept in a solitary cell to keep him away from other terror cell suspects and to prevent the cell

-14-

members from influencing each other to refuse to cooperate.  Mr.
Abu Ali was initially questioned in a conference room at the jail
by the Captain and the Brigadier General.  The interrogation
occurred in the evening after evening prayers and continued into
the early morning hours because it is very hot during the day, as
is the custom in Saudi Arabia.  The practice of questioning and
working during the night was not an attempt to deprive Mr. Abu
Ali of sleep.  The Court notes that many of our court sessions in
this case were conducted during what are the evening hours in
Saudi Arabia.

In the first and second interrogation sessions with Mr. Abu
Ali, he was nervous and upset, but respectful.  Mr. Abu Ali sat
in a chair at the table.  According to the Brigadier General, Mr.
Abu Ali sat straight up, and rocked back and forth, in the chair.
The Brigadier General and the Captain did not detect any bruises
or sense any discomfort in the defendant's physical condition.
Neither the Brigadier General nor the Captain observed the
defendant hold himself in a way to guard his back, as he might if
his back were injured or bruised.  On the contrary, the Brigadier
General and the Captain reported that when the defendant relaxed,
he rocked with his back firmly in the chair.  The Captain also
reported that, at one point, Mr. Abu Ali sat with one foot on the
chair and swivelled.  The Brigadier General and the Captain
testified that Mr. Abu Ali was not blindfolded or handcuffed
during interrogations.  They stated that Mr. Abu Ali was granted
breaks, access to food, water, a bathroom, and refreshments

during breaks in questioning.

The Captain testified that during the second session when Mr. Abu Ali began his lengthy and detailed confession, Mr. Abu Ali "sprung information like a springing water balloon."  The session lasted nearly seven hours because Mr. Abu Ali was very forthcoming.  The Captain said that once he confronted the defendant with the names "Ashroff" and "Reda" and other information, Mr. Abu Ali asked, "Do you have al-Faq'asi?  Did you arrest all of them?"  The Captain falsely told Mr. Abu Ali that al-Faq'asi was in the room next door to the interrogation room. Mr. Abu Ali looked nervous.  The Brigadier General testified that after this exchange, Mr. Abu Ali said that in the event the Saudis were to hand him over to the United States, he would deny his confession.  The Brigadier General placated Mr. Abu Ali by telling him that the United States did not know about his arrest with the cell, and that he would be tried in Saudi Arabia with members of his cell.  The Brigadier General assured Mr. Abu Ali that he would be treated fairly by his Muslim brethren.  On cross-examination, the Brigadier General acknowledged that Mr. Abu Ali may expect, but he did not say, that as a Muslim, Mr. Abu Ali would expect to be treated fairly.

The Brigadier General admitted that he has threatened an inmate before.  As the Court's notes indicate, he once tied a person to a tree for five minutes in connection with questioning. He denies engaging in such behavior in this case.  To be sure, some of the testimony of the Captain was questionable.  The

Captain said he never used force on a suspect.  The Captain said
he has never had a suspect refuse to be questioned by him or to
sign a written confession statement log.  He has been an
interrogator for seven years, and, according to him, each person
he questions confesses or gives a statement.  Additionally, the
warden from the Medina prison described the detention facility in
Medina as a residential type building without a kitchen where the
prisoners were permitted to order their meals.

**5. The July 24, 2003, Videotape of Mr. Abu Ali Reading his
Confession.**

During the interrogation process, on July 24, 2003, Mr. Abu
Ali was taken to an interrogation room and directed to read his
written statement.  The videotape was played for the Court, not
to consider its content, but so that the Court could observe Mr.
Abu Ali's demeanor during the reading.  Mr. Abu Ali acknowledged
in court that he did not know he was being videotaped when he
read this statement.  In Mr. Abu Ali's own words, his behavior on
the videotape was "nuts."  The Court concurs that the behaviors
exhibited during the tape show noteworthy demeanor.  During the
tape, it is apparent that Mr. Abu Ali is under some stress
because a person outside camera range is telling him to read the
statement and observing him the whole time.  Mr. Abu Ali appears
at times to be relaxed, smiling, and laughing.  He seemed to
laugh at a mention of "Al-Qaeda" and yawns at one point in the

videotape.  Mr. Abu Ali acknowledged in his testimony that he ad libbed certain statements that are not in the prepared text spontaneously and without orders from his interrogators.  He asked for water and received it while reading the statement.  In two instances, he exhibited unusual behavior.  In one place, he acknowledges receiving certain training to conceal his identity and he laughs and says something to the effect of, "Well I guess that did not work out" or "I guess we see how that worked out." Additionally, he was reading a statement when he spontaneously, without direction, simulated cocking a weapon or automatic type rifle.

### 6. The Live Testimony in Alexandria, Virginia.

The Suppression Hearing testimony also included live testimony from a number of witnesses in this Court beginning October 11, 2005 and ending on October 20, 2005.  Again, the Court will not recount in detail all of the witnesses' testimony. Rather, the Court will generally review certain testimony that is most pertinent to the instant Motions.

### Special Agent Maria Joycs:

Agent Maria Joycs is a supervisory special agent with the FBI assigned to the Counterterrorism Unit.  She was deployed to Riyadh, Saudi Arabia in May 2003 to investigate the bombings that occurred on May 12, 2003, in which nine (9) American citizens

were killed. She testified that no one from the United States had anything to do with Mr. Abu Ali's arrest and detention. On June 10, 2003, Agent Joycs sent an e-mail to her supervisors, based on information received from a memorandum from the Mabahith on June 9, 2003, informing them that the Mabahith were interrogating Mr. Abu Ali.

The Mabahith memorandum to the United States stated that the Saudis had a lead that an American citizen detained in Saudi Arabia had a plan for a terrorist operation. The June 9, 2003, memorandum identified Mr. Abu Ali as the detainee and informed the FBI that his interrogation was underway. The memorandum did not describe any terrorist plan. Upon learning of his arrest, the FBI sought access to Mr. Abu Ali. Agent Jocys wrote a memorandum to the Saudi officials requesting an interview with Mr. Abu Ali on June 10, 2003. *See* Gov't Ex. 72. The Mabahith responded on June 12, 2003 that the FBI may see Mr. Abu Ali "soon," which Agent Joycs interpreted as a denial. *See* Gov't Ex. 6S. Agent Jocys said she first heard of a report that Mr. Abu Ali might have a plan involving the President of the United States on June 13, 2003. FBI headquarters directed FBI Agent and Legal Attache Eduardo Sanchez to seek to secure immediate access to Mr. Abu Ali, to investigate the allegations to determine if the plan was imminent, and to determine whether Mr. Abu Ali was associated with Al-Qaeda. Again, the Saudi government denied the FBI direct access to Mr. Abu Ali.

The June 15, 2003, Interrogation of Mr. Abu Ali and the
     FBI-Secret Service Role.

        The Mabahith refused to allow the FBI and Secret Service
to interrogate Mr. Abu Ali despite requests through various
channels.  However, the Saudi government agreed to allow the FBI
and Secret Service to observe its interrogation of Mr. Abu Ali on
June 15, 2003, and to provide questions for Mr. Abu Ali.  In
preparation for this interrogation, Agent Joycs, Agent Glenn
Posto, and others in the Legal Attache's (hereinafter "Legat")
office prepared a list of questions they wanted the Mabahith
interrogators to ask Mr. Abu Ali.  *See* Gov't Exs. 7S-8S.  Agent
Joycs did not witness the interrogation on June 15, 2003.  She
stated that the FBI agents who drafted the questions did not
consider using the Mabahith to avoid the requirements of *Miranda*.
There was no discussion of *Miranda* in their preparation of
questions for Mr. Abu Ali.  She viewed the interview as an
intelligence gathering interview, rather than a criminal
investigation, meant to determine if there were any imminent
threats of terrorism that could be prevented.  At that time,
Agent Jocys was unaware of any plan to prosecute Mr. Abu Ali in
the United States, and Mr. Abu Ali was in Saudi custody in
connection with a Saudi investigation of the Riyadh bombings.

        On cross examination, defense counsel challenged Agent Joycs
about the extent of the FBI's cooperation with the Saudi

officials.  Agent Joycs stated that the FBI worked independently, but that the Saudi officials arranged Mr. Abu Ali's interrogation.  Defense counsel also challenged whether Agent Joycs knew about Mr. Abu Ali's detention on June 8, 2003, because the Legat's office received notice of his arrest from the Saudis on June 8, 2003, and Agent Joycs admitted that she got her information from the Legat's office on June 9, 2003.  Her e-mail to headquarters on the morning of June 10, 2003 corroborates when she learned of Mr. Abu Ali's arrest.  *See* Gov't Ex. 4S.  In addition, Agent Joycs admitted that she did not observe the June 15, 2003, interrogation.  Also, when pressed about whether she gave *Miranda* warnings to Mr. Abu Ali, she distinguished between an intelligence interview and a criminal investigation interview.

Agent Jocys reported that when the FBI met with the Saudi Brigadier General prior to the June 15, 2003, interrogation, the Brigadier General assured the FBI that Mr. Abu Ali would not walk free and that Mr. Abu Ali would be charged with various terrorism related offenses.  Agent Jocys testified that the Brigadier General was "adamant that this is not the time to introduce American interviewers to Abu Ali.  It is his belief that Abu Ali's cooperation would dry up.  We stressed the need to have access to the interrogator to discuss information/questions-the Brig[adier] General will make this happen as soon as they possibly can."  *See* Gov't Ex. 10S.  Agent Jocys acknowledged that, in connection with an application for a search warrant for Mr. Abu Ali's home in Falls Church, Virginia, Agent Sanchez

stated in an e-mail that "the Saudis will do what we ask, but prefer not to give information that will become public." *See* Def.'s Ex. 1 (AA426).

**Special Agent Glenn Posto:**

Agent Posto is a special agent with the FBI assigned to the Counterterrorism Unit.  He was deployed to Riyadh, Saudi Arabia, in May 2003 to investigate the bombings that occurred on May 12, 2003, in which nine (9) American citizens were killed.  He stated that he learned about Mr. Abu Ali's detention on June 14, 2003, and was assigned to observe the Mabahith's interrogation of Mr. Abu Ali on June 15, 2003.  To prepare for this interrogation, he prepared (along with Agent Joycs and the staff of the Legat's office) a thirteen (13) question memo (with approximately fifty-six (56) parts and subparts) for the Mabahith to ask Mr. Abu Ali during the interrogation.  The Mabahith informed him, through an interpreter, that there were too many questions and they cut the thirteen (13) questions down to six (6), all of which the Mabahith asked Mr. Abu Ali during the interrogation.

Agent Posto, Agent Fritz Donner, Language Specialist Elias Machanaly, and two Mabahith officers were in one room behind a one-way mirror observing the interrogation.  The language specialist could hear the interrogation over a cell phone and the language specialist translated for the group.

During the interrogation, Agent Posto observed Mr. Abu Ali's demeanor.  Agent Posto observed Mr. Abu Ali enter the

interrogation room.  He testified that Mr. Abu Ali walked without a noticeable limp or discomfort.  Agent Posto further testified that Mr. Abu Ali did not appear to be favoring any parts of his body or have any visible injuries.  Agent Posto recounted that Mr. Abu Ali seemed relaxed, smug, and laughed with the Mabahith interrogator.  Mr. Abu Ali sat in the chair with his back against the chair.  At times, he slid down in the chair, he leaned forward, and he sat forward in the chair.  Mr. Abu Ali did not appear to be in any discomfort.  Agent Posto did not observe a blindfold, handcuffs, or shackles on Mr. Abu Ali when Mr. Abu Ali entered the interrogation room.  Mr. Abu Ali did not make any complaints about his confinement that Agent Posto could discern.

Agent Posto stated that the FBI agents did not have any discussions about how to circumvent Mr. Abu Ali's *Miranda* rights. He stated that this was an intelligence interview rather than a criminal interview.  He also stated that it was the State Department's job to assist with consular visits, not the FBI's responsibility.

Agent Posto reported that the interrogation went on for about two hours with one ten to fifteen minute break.  Mr. Abu Ali was given water.  The Brigadier General left the interrogation room once to come over to consult with the FBI and Secret Service at the end of the interview.  No FBI or Secret Service agent questioned Mr. Abu Ali or was presented to Mr. Abu Ali on June 15, 2003.  Agent Posto denied posing any questions through the Brigadier General about the so-called "Paintball

Case" defendants, including Benkala and others.

**Elias Machalany:**

Mr. Elias Machalany, a language specialist for the FBI, testified about his observation of Mr. Abu Ali's interrogation on June 14 or 15, 2003.  Mr. Machalany testified that on either June 14 or 15, he learned from two special agents in the Legat's office that an American, Mr. Abu Ali, had been arrested by the Saudis.  Other agents prepared a list of approximately thirteen (13) questions (with approximately fifty-six (56) parts and subparts) that they wanted the Saudis to ask Mr. Abu Ali.  Mr. Machalany then translated those questions into Arabic.  The Saudis responded that the list of questions was too long, and asked the FBI to submit fewer questions.  The FBI then cut the list of questions to six (6), which they gave to the Saudis.

On the night of June 15, 2003, Mr. Machalany was one of three (3) American FBI employees who traveled to a Riyadh prison and observed an interrogation of Mr. Abu Ali by two officers of the Saudi Mabahith.  Mr. Machalany and two FBI special agents, Posto and Donner, watched the entire interrogation from behind one-way glass.  The interrogation was conducted by one Saudi, who was dressed similarly to Mr. Abu Ali, and another Saudi was present in the room.  Mr. Machalany testified that neither appeared to be armed.  Around or after midnight, the Saudis brought Mr. Abu Ali into the interview room and began the interrogation.  Mr. Machalany testified that from his vantage

point behind the glass, he could see Mr. Abu Ali when the door to the interview room opened.  At that point, Mr. Abu Ali was handcuffed.  He saw the Saudis remove the handcuffs, and Mr. Abu Ali then entered the room under his own power, without assistance.  Mr. Abu Ali wore a thobe - a long robe-like garment, a cap, and he appeared to have a smirk on his face.

Mr. Machalany testified that Mr. Abu Ali exhibited no pain or discomfort when he entered the room, or at any point during the interrogation.  At no point in the interrogation did Mr. Abu Ali complain about his treatment while in Saudi custody, either in Riyadh or Medina.  The interrogator's tone of voice was normal, conversational, and the interrogator did not threaten Mr. Abu Ali.  When the interrogator asked Mr. Abu Ali to stop fidgeting, he did so.  Mr. Machalany did not observe any cuts or bruises on Mr. Abu Ali, although he noted in response to a question on cross-examination that he did not see Mr. Abu Ali shirtless, and he did not see Mr. Abu Ali's back.  Mr. Machalany also testified that Mr. Abu Ali frequently fidgeted in his seat throughout the interrogation, sometimes sitting on his feet, until the interrogator asked him to stop.  Although on direct examination Mr. Machalany had testified that Mr. Abu Ali was relaxed and comfortable throughout the interrogation, on cross examination he conceded that one possible explanation for his fidgeting was that Mr. Abu Ali was in pain.  However, Mr. Machalany also testified that Mr. Abu Ali did not grimace or make any facial expression as he moved around in the chair.

Mr. Machalany testified that before the interview began, Mr. Abu Ali asked the interrogator whether the U.S. government knew he was in Saudi custody.  The interrogator responded by saying something to the effect of, "Like I told you before, I will not let the Americans know you are here."  Mr. Machalany testified that he interpreted this comment to mean that Mr. Abu Ali did not want the United States to know he was in custody.

Mr. Machalany testified that the Saudi Mabahith interrogator asked many questions about locations in Saudi Arabia unrelated to those provided by the FBI during the course of the interview, which lasted about an hour.  The interrogator asked the six questions provided by the FBI, but Mr. Machalany testified that he did not ask any follow-up questions.  Although Mr. Machalany testified that in January 2005 he told someone from the U.S. Attorney's Office that the interrogator had asked follow-up questions, he testified that he is now "100 percent certain" that he was mistaken when he said that.  Mr. Machalany noted that although he did not participate in any other interviews during his 52-day stay in Saudi Arabia, he subsequently took part in "hundreds" of interviews in Iraq, and that after making that representation to the U.S. Attorney's Office, he realized that his statement about the follow up questions was incorrect.

**Alex Daghestani:**

Mr. Alex Daghestani, a language analyst for the FBI, testified about various documents that he helped prepare for the

-26-

government by translating them from Arabic into English.  He
testified that before the government uses a translated document
in court, the person who first translated it discusses his or her
work with an "editor."  A third person then also reviews the
original document and the translated document.  If there is a
disagreement about an aspect of the translation, Mr. Daghestani
testified that the opinion of the person who will testify about
the document in court will usually be followed.

Mr. Daghestani testified that he did not translate Mr. Abu
Ali's videotape confession, but that he certified it.  Mr.
Daghestani also testified that some items that appear in brackets
in the transcript are descriptions of Mr. Abu Ali's demeanor,
which were made by the person who translated the video and with
which Mr. Daghestani concurs.  Defense counsel also asked Mr.
Daghestani why the transcript did not include a voice saying,
"read," in Arabic at the 1 minute and 20 second mark of the
video.  Mr. Daghestani testified that he did not recall whether
or not he heard a voice saying "read" at that point in the video.

**Charles Glatz:**

Mr. Charles Glatz, a consular officer for the U.S.
Department of State, testified about a series of meetings he had
with Mr. Abu Ali while he was in Saudi custody.  As a consular
officer in Saudi Arabia, Mr. Glatz frequently met with Americans
who had been arrested by Saudi authorities.  On June 11, 2003, he
learned from the FBI's Legat office that Mr. Abu Ali, an American

-27-

citizen, had been arrested by the Saudi Mabahith.  Following his normal practice in such situations, Mr. Glatz prepared a request to Saudi officials to meet with the detained American.  Mr. Glatz testified that typically it would take three to four weeks for the Saudis to allow him to visit Americans who had been detained by the Mabahith.  On July 8, 2003, he was allowed the first consular access to Mr. Abu Ali.

Mr. Glatz testified that one of his priorities in a visit with detained Americans is to gauge the citizen's well-being, and determine if the citizen is being mistreated.  Mr. Glatz had previously visited two (2) Americans arrested by the Mabahith (both were arrested before September 11, 2001) while they were in custody, and neither had complained of mistreatment.  However, on cross-examination, Mr. Glatz testified that he was aware that Canadian and British citizens arrested at the same time as one of the Americans had later claimed they were tortured by Saudi officials while they were in custody.

Mr. Glatz testified that during their first meeting on July 8, 2003, he found no indication that Mr. Abu Ali was being mistreated.  Mr. Glatz brought Mr. Abu Ali a letter from his mother that Mr. Glatz read to him, as the Mabahith official watching the meeting would not let Mr. Glatz give the letter to Mr. Abu Ali.  Likewise, the Mabahith official would not allow Mr. Glatz to give Mr. Abu Ali a list of local attorneys.  Mr. Glatz did not observe any signs that Mr. Abu Ali had been physically harmed.  Although Mr. Abu Ali was wearing a thobe, no cuts or

bruises were visible on his hands, face, neck, or feet.  He
appeared physically fit and had no problem standing up, taking
several steps toward Mr. Glatz, shaking hands, or sitting down.
Mr. Glatz said he questioned Mr. Abu Ali about his treatment in
custody.  Mr. Abu Ali said that the lights were kept on 24 hours
a day, but in response to a question from Mr. Glatz, Mr. Abu Ali
did not say that this practice had caused him any sleep
deprivation.  Mr. Glatz also testified that Mr. Abu Ali told him
that his treatment had been "excellent," "kind," and "humane" -
words that Mr. Abu Ali himself used.  Mr. Glatz testified that
the meeting took place in a reception type area where there were
sofas and chairs.  Mr. Abu Ali was seated on a sofa, and a Saudi
Government official was in the room watching and taking notes.
Prior to the meeting, Saudi Mabahith officials advised Mr. Glatz
not to discuss the case with Mr. Abu Ali.  Mr. Glatz tried to
have Mr. Abu Ali review and sign a Privacy Act waiver of
information so the State Department Consul could contact Mr. Abu
Ali's family and let them know of the visit, but the Mabahith
officer present would not allow Mr. Abu Ali to sign it.  Mr. Abu
Ali was instructed prior to the Consul meeting not to discuss his
treatment and not to sign anything concerning his rights.  Mr
Glatz wrote reports of his consular visits with Mr. Abu Ali.

    Mr. Glatz testified that in his subsequent visits with Mr.
Abu Ali on August 11, September 6, October 5, November 4, and
February 17, he asked similar questions about the Saudis'
treatment of Mr. Abu Ali.  During each of those visits, he heard

no complaints of mistreatment from Mr. Abu Ali and did not observe any physical indications that Mr. Abu Ali might have been mistreated.  On cross-examination, Mr. Glatz testified that he has never met an American citizen who has been tortured by the Saudis.

On cross-examination, Mr. Glatz testified that during their first visit, Mr. Abu Ali told him that he wanted to be treated as an American citizen.  Mr. Glatz noted that the biggest problem was that Mr. Abu Ali was being "held incommunicado."  Thus, even if he had a lawyer, under the Saudi system an attorney could not have visited him during the investigation.  Mr. Glatz testified that if Mr. Abu Ali had been charged by the Saudis following their investigation, the United States Department of State would have helped him obtain a lawyer.  Mr. Glatz stated that, in the September 2003 visit, Mr. Abu Ali selected a lawyer but was not allowed to contact the lawyer and had no funds to hire a lawyer. The State Department does not pay for lawyers for United States citizens detained abroad.

Despite Mr. Abu Ali's statement about wanting to be treated as an American citizen, Mr. Glatz testified that during his visit in either September or October, Mr. Abu Ali also asked the consular officer, "Why are you asking me all these questions [about the conditions of my confinement]?  I don't have a problem with Saudi Arabia; I have a problem with the U.S. government." On May 10, 2004, Mr. Glatz went to the Saudi prison facility to meet with Mr. Abu Ali, but the prison director told Mr. Glatz

that Mr. Abu Ali did not want to see him.  Mr. Glatz testified
that he responded that he wanted to hear that from Mr. Abu Ali
himself, but the prison director responded that he could not use
physical force to bring Mr. Abu Ali from the cell block to see
Mr. Glatz.  The prison director also told Mr. Glatz that Mr. Abu
Ali was considering "going to Sweden" if he was allowed to leave
Saudi Arabia.

On cross-examination, Mr. Glatz testified that he had
exchanged e-mails with Mr. Abu Ali's parents while he was
detained in Saudi Arabia.  Because the defense had not previously
been told of the existence of such potential *Jencks* material,
both parties attempted to locate copies of the e-mails.  Several
e-mails were produced that afternoon, both by Mr. Abu Ali's
parents and the government.  In one e-mail, the parents told Mr.
Glatz that they were concerned because their son had told them
that he had been abused to the point that his hands hurt so much
he could not pick up a pen.  In a reply e-mail, Mr. Glatz told
the parents that, during his visits with Mr. Abu Ali, he had
neither seen physical evidence of abuse on their son nor been
told by Mr. Abu Ali of such abuse in response to questions about
his treatment.

During Mr. Glatz's September 6, 2003, and October 6, 2003,
consular visits, Mr. Glatz said there were a couple of five-
second intervals when he and Mr. Abu Ali were alone and out of
earshot of the Mabahith official observing the meetings.  Mr. Abu
Ali did not make any private complaint to him at these times.

Mr. Abu Ali testified he recalled at least one of these occasions of privacy.  Mr. Abu Ali testified that while he considered making a complaint, he decided not to complain because he was afraid and it did not appear that the United States consul could do anything to help him.  Mr. Abu Ali recalled that the consul could not secure a pen and piece of paper for him, could not arrange a phone call, or get him a lawyer, and so he saw no point in complaining to the consul about physical abuse.  Mr. Glatz noted that Mr. Abu Ali reported that he was returned to general population in the prison by August 11, 2003, and that he was enjoying interacting with others.

During the October 6, 2003, consular visit, Mr. Glatz said that Mr. Abu Ali informed him that he had been questioned and threatened by the FBI and Secret Service.  After the FBI and Secret Service questioning, he was held in solitary confinement. Mr. Abu Ali told Mr. Glatz that the FBI and Secret Service had presented him with three options:  (1) cooperate and he would be prosecuted in Saudi Arabia and serve a life sentence; (2) cooperate and he would be prosecuted in Saudi Arabia and after that prosecution, he would be prosecuted in the United States; and (3) he could be returned to the United States and declared an "enemy combatant" and he would be held in prison indefinitely. Mr. Abu Ali asked Mr. Glatz if he could be tried in Saudi Arabia. Mr. Abu Ali also gave Mr. Glatz an oral Privacy Act waiver so that his family could receive information about the United States Consul's visits. *See* Gov't Ex. 15S.

-32-

During the November 4, 2003, consular visit, Mr. Abu Ali asked Mr. Glatz how he could go about renouncing his United States citizenship.  Mr. Abu Ali wanted information about the process.  Mr. Abu Ali remained in solitary confinement from September, 2003, until January, 2004.  Mr. Abu Ali reported he was allowed to call his parents every fifteen days after August 2003.

**Gilbert Sperling:**

Gilbert Sperling, a retired foreign service officer, testified about a roughly one-hour meeting he had with Mr. Abu Ali on August 31, 2004.  Although Mr. Sperling is retired, he is on a list of retired officers who are called upon by the Department of State for temporary duty when there is a staffing gap.  From late May, 2004, to early September, 2004, Mr. Sperling was serving in such a capacity at the United States Embassy in Saudi Arabia.  While he was there, Mr. Sperling conducted one of the routine monthly consular visits with Mr. Abu Ali during his detention.

Before his visit to the prison, Mr. Sperling read the Embassy's file on Mr. Abu Ali, which said that the Saudi Foreign Ministry had described Mr. Abu Ali as having become "somewhat belligerent towards the guards," and stated that "his living conditions were more like an apartment . . . than a cell," and that he had not signed a Privacy Act waiver.  During his visit, Mr. Sperling found Mr. Abu Ali to be relaxed, and did not find

-33-

him fearful, tired, or disoriented.  He did not see any indications of physical mistreatment or abuse.  Mr. Sperling testified that when he asked about his treatment, Mr. Abu Ali said his only complaint was that he was not a free person.  He also testified that there "seemed to be a friendliness" between Mr. Abu Ali and the prison officials.

Although Mr. Abu Ali's first question of Mr. Sperling was whether he knew of any developments in his case, he testified that before the visit began, he had been asked by a Saudi prison official not to discuss details of the case with Mr. Abu Ali.  On cross-examination, Mr. Sperling said he complied with that request, and that it was easy to do so because he did not have any new information to provide, anyway.  Instead, they discussed Mr. Sperling's work in Mexico and the country of Georgia.  Mr. Sperling was impressed by Mr. Abu Ali's knowledge of world politics and geography.  Mr. Sperling testified that other than their visit, which lasted about one hour, he has had no contact with Mr. Abu Ali.

**Luke Kuligoski:**

FBI Special Supervisory Agent Luke Kuligoski testified about his participation in the interrogation of Mr. Abu Ali by members of American law enforcement while he was in Saudi custody.  Agent Kuligoski traveled to Saudi Arabia in September 2003 to interrogate Mr. Abu Ali.  Agent Kuligoski testified that it was the first time members of American law enforcement had met with

-34-

Mr. Abu Ali.

During their meetings, Agent Kuligoski observed no noticeable marks on Mr. Abu Ali.  He testified that Mr. Abu Ali looked healthy and physically fit, did not appear to favor any parts of his body, and seemed relaxed and comfortable.

Agent Kuligoski also testified that Mr. Abu Ali seemed very interested in what might happen to him and stated that he would prefer to stay in Saudi Arabia.  He testified that Mr. Abu Ali said he was afraid of being tried in the United States because he did not want to be the first U.S. citizen arrested after the attacks of September 11, 2001.  Mr. Abu Ali never expressed any interest in returning to the United States, Agent Kuligoski testified.

On cross-examination, Agent Kuligoski testified that Agent Barry Cole told him that at his first solo meeting with Mr. Abu Ali in Saudi Arabia, Mr. Abu Ali had said he did not want to talk without a lawyer present.  Mr. Kuligoski also said that he was aware that Mr. Abu Ali had previously requested a lawyer.

Before he traveled to Saudi Arabia, Agent Kuligoski visited Mr. Abu Ali's parents and told them that he was going to Saudi Arabia to "speak with their son."  He asked the parents if they wanted him to take anything to their son, and they gave him a letter and a picture of Mr. Abu Ali's younger brother.

Agent Kuligoski testified he participated in the questioning of Mr. Abu Ali.  Mr. Abu Ali did not appear to be in any discomfort and there were numerous occasions when no Mabahith

-35-

officer was present in the interview.  Agent Cole delivered the
letter from Mr. Abu Ali's parents and the photograph.  Agent
Kuligoski then wrote down Mr. Abu Ali's claim that he had given
the Saudis false information because he was tortured.  *See* Gov't
Ex. 23S.  The statement in Agent Kuligoski's notes reads, "He
said he wrote a lot of things that weren't true, because he said
the Saudis used torture techniques."  Agent Kuligoski said that
Mr. Abu Ali called it "torture techniques" and that it was a
Muslim matter and the agent would not understand.  Agent
Kuligoski also says that Mr. Abu Ali also told him that he
"enjoyed" his time in the Saudi prison interacting with other
inmates and playing soccer.  In response to a question from the
Court, Agent Kuligoski defined "torture" as any duress -
including deprivation of food or sleep and beatings - that is
used "to get someone finally to break down and talk."  Agent
Kuligoski testified that he does not recall the context of Mr.
Abu Ali's assertion that the Saudis used "torture techniques"
upon him, but says that when Agent Cole asked Mr. Abu Ali to
expand on that claim, he did not.  Mr. Abu Ali did not complain
about beatings, being punched or kicked, having his hair or beard
pulled, being deprived of sleep, or being hung from the ceiling
in his cell with his hands above his head.

Agent Kuligoski testified that, as he was gathering his
materials up to leave at the end of the FBI interview on
September 18, 2003, and only he and Mr. Abu Ali were in the room,
Mr. Abu Ali asked for a pen and a piece of paper to write a note

to his family.  Agent Kuligoski gave Mr. Abu Ali paper a pen to
write a letter to his parents, and Agent Kuligoski said he would
deliver it to his father as Mr. Abu Ali requested.  Mr. Abu Ali
wrote a letter to his family without any prompting or orders from
him or Agent Cole.  *See* Gov't Ex. 22.  Mr. Abu Ali acknowledged
that, in the letter, he referred to Agent Kuligoski as "a great
man" and that " he was not under any pressure" to write the
letter to his family.  It was Mr. Abu Ali's own decision to
include the reference to Mr. Kuligoski and to the lack of
pressure.

Agent Kuligoski was also responsible for helping to prepare
the affidavit for the search warrant concerning Mr. Abu Ali's
Falls Church, Virginia, home and for executing that search.
Agent Kuligoski acknowledged that Mr. Abu Ali was a suspect in
the so-called "Virginia Paintball Case" in Alexandria, Virginia.
Agent Kuligoski testified that Mr. Abu Ali's brother was present
in the apartment at the time of the search and that he pointed
out items that belonged to Mr. Abu Ali.  The results of the
search, including the inventory and copies of documents, were
sent to the Mabahith.

On cross-examination, Agent Kuligoski said that Mr. Abu Ali
was questioned for four nights, on September 14, 16, 17, and 18,
2003.  Mr. Abu Ali was not questioned on September 15, 2003.
Agent Kuligoski did not participate in the interrogations on
September 14.  The interrogations were conducted in a conference
room, and Mr. Abu Ali was given breaks, food, and water.  Agent

Kuligoski admits that, during these interviews with Mr. Abu Ali, the agents did discuss the so-called "three options" about cooperation with Mr. Abu Ali.  Specifically, they discussed the prospect of Mr. Abu Ali's being prosecuted in Saudi Arabia, being prosecuted in Saudi Arabia and the U.S., being declared an "enemy combatant," and being incarcerated indefinitely, perhaps for life without a trial, in the United States.

**Barry Cole:**

Special Agent Barry Cole of the FBI testified that he first saw Mr. Abu Ali on September 14, 2003, and that he spent between thirty (30) to thirty-five (35) hours with him over the course of four meetings.  For about twelve (12) to sixteen (16) hours of their interviews, no members of the Mabahith were present. During their four meetings, Agent Cole testified that he was seated about three feet from Mr. Abu Ali, and that Mr. Abu Ali appeared to be relaxed and in good health.  He said that Mr. Abu Ali's only complaint came on the third or fourth meeting, when he claimed that the Saudis had subjected him to mental torture. When Agent Cole asked him to explain, Mr. Abu Ali said Agent Cole would not understand because it was a "Muslim thing."

On cross-examination, Agent Cole testified that Mr. Abu Ali did ask for an attorney in their first meeting, but Agent Cole told him that he was not entitled to an attorney in Saudi Arabia. Agent Cole testified that he asked the Saudis to put Mr. Abu Ali in isolation during the time frame of the September FBI

interrogations, and that the Saudis "granted my request."

Agent Cole testified that the purpose of his interviews was to "gather intelligence."  He said that he approached his interrogation of Mr. Abu Ali as though Mr. Abu Ali was a terrorist.  Agent Cole denied that he left the room after Mr. Abu Ali said that the Saudis had tortured him, and said that he did not tell the Saudi Brigadier General at the prison about the allegation.  He testified that, when he returned to the United States, he had a conversation with his supervisor in the Washington Field Office about Mr. Abu Ali's claim that he had been tortured.  He did not follow up on the claim with the Department of State.


**Dr. Richard Schwartz:**

Dr. Richard Schwartz, the Chairman of Emergency Medicine at the Medical College of Georgia and a contractor for the FBI, testified about conducting a medical exam of Mr. Abu Ali when he boarded a United States government plane in Saudi Arabia for a flight to the U.S. on February 21, 2005.  Dr. Schwartz testified that he performed a general medical exam on Mr. Abu Ali for three reasons:  (1) to ensure that he was in adequate health for the long flight; (2) to see if he had a history of infectious diseases; and (3) to look for signs of abuse.  On cross-examination, Dr. Schwartz said that, prior to the trip, he had not been informed of any allegations by Mr. Abu Ali that he had been tortured, and that he had only inquired into his medical

-39-

condition.

Dr. Schwartz testified that Mr. Abu Ali was awake, alert, well-rested, and well-nourished, but that he seemed somewhat anxious. He testified that he asked Mr. Abu Ali if he had been mistreated and Mr. Abu Ali said nothing about any type of mistreatment, and that the only aspect of his confinement that he described that could be considered psychological mistreatment was his having been placed in solitary confinement. The only physical ailment Mr. Abu Ali mentioned was some pain in his right shoulder, which Dr. Schwartz thoroughly examined and found to be "essentially normal." Mr. Abu Ali also said that he thought his vision was not as acute as it had been before he entered solitary confinement, and mentioned that he had previously had Lasik eye surgery.

During the physical exam, Dr. Schwartz looked at and touched Mr. Abu Ali's back and abdomen. Dr. Schwartz also did a full skin examination. Mr. Abu Ali had no reaction to being touched in either area. Dr. Schwartz testified that he observed three or four small circular and linear areas of increased pigmentation on his back. The marks were flat, not depressed or raised. There were no linear marks on his neck. He said that the circular marks were probably acne scarring, and that the linear marks could be from "almost any number of things," but that they "appeared inconsequential." Dr. Schwartz testified that he has treated many patients who have been beaten or whipped, and that there is no "usual" pattern of marks from such abuse, and that it

-40-

is also possible for such abuse to leave no marks at all.  While there is no typical case for beating victims, it is not uncommon for marks to appear on the whole back.  Dr. Schwartz's opinion was that the marks he observed were not evidence that Mr. Abu Ali had been subjected to non-accidental trauma.  Dr Schwartz admitted that this opinion was not in his medical report because he did not think it was significant, and no one had alerted him that Mr. Abu Ali had claimed he was a victim of torture.

On cross-examination, Dr. Schwartz testified that he did not mention the marks on Mr. Abu Ali's back in his report because he thought they were inconsequential.  He also said that he sees "these kinds of marks on people all the time."  He did not ask Mr. Abu Ali about the marks and did not ask the photographer to take pictures of them.  He also testified that he has not examined other people who have been tortured in Saudi Arabia.

Dr. Schwartz testified that, during the flight back, he gave Mr. Abu Ali some Tylenol when he complained of a headache and some anti-nausea medication when the plane encountered some turbulence.  Dr. Schwartz also testified that Mr. Abu Ali was blindfolded when he boarded the aircraft, and that two FBI Hostage Rescue Team members were present during his exam.


**Dennis Hankins:**

Dennis Hankins, a consular officer for the Department of State, testified about two meetings he had with Mr. Abu Ali in Saudi Arabia:  (1) a consular visit on October 23, 2004; and (2)

at the airport in February 2005, when Mr. Abu Ali was flown to the United States.

Mr. Hankins testified that his visit with Mr. Abu Ali in October was a "routine consular visit."  He had previously been told that Mr. Abu Ali was not cooperative, and that there was "high level DOJ interest" in his case.  During their visit, Mr. Hankins testified that he found Mr. Abu Ali to be confident and at ease.  He carefully watched how Mr. Abu Ali entered the room to look for signs of abuse, but saw no sign of a limp or any other indications of mistreatment.  Mr. Abu Ali made no reference to any type of mistreatment, other than complaining that the food was monotonous, Mr. Hankins testified.  Mr. Abu Ali wanted to know the status of his parents' lawsuit against the U.S. government.

In February 2005, Mr. Hankins spent about ten minutes visiting Mr. Abu Ali aboard the FBI aircraft that would take him to the United States.  He testified that his reasons for being there were to have a consular officer present, to again attempt to have Mr. Abu Ali sign a Privacy Act Waiver, and to ask Mr. Abu Ali why he had stopped calling his parents in November 2004.

Mr. Hankins testified that Mr. Abu Ali told him he wished he had previously been able to tell him about his treatment in the prison, but that there had always been a Saudi guard present. Mr. Abu Ali told him that he long wanted to speak to a consular officer in private.  He did not say anything about being physically mistreated, but said that he had not refused a

consular visit, and that any Saudi claim that he had done so was "typical of the mind games" that they played on him.  Mr. Hankins testified that if he had more time, he would have asked more questions of Mr. Abu Ali at that time.

### Brian Balgaard:

Brian Balgaard, a FBI Special Agent, testified about his presence on the rendition flight that took Mr. Abu Ali from Saudi Arabia to the United States.  He said that Mr. Abu Ali was handcuffed and shackled during the 17-hour flight, and that he was also blindfolded during takeoff and landing to keep him disoriented.  He was allowed to pray during the flight and also fed three meals.  Agent Balgaard testified that although Mr. Abu Ali seemed tense, he seemed to relax during the flight and had several conversations with the FBI personnel aboard.  On cross-examination, he testified that Mr. Abu Ali asked if an attorney and consular officer were present on the plane, and was told "no" as to both questions.  He also testified that Mr. Abu Ali fell asleep shortly after takeoff.

Agent Balgaard testified that the FBI requested Mr. Abu Ali's medical records from the Mabahith in July 2004, and that the Saudis provided medical documents to the Legat's office in Saudi Arabia in January 2005.  In addition, the FBI requested any taped phone calls of Mr. Abu Ali in July 2004, and the Saudis produced some CD-ROMs of taped phone calls in late January 2005.  However, the linguist cross-checked those calls, and they

appeared to be ones the FBI already had.  Subsequently, it became clear that another tape was missing, and the FBI made a formal request for that tape in March 2005.  The Saudis provided a CD of that call about one week later.

**Mohamed Adra:**

Mr. Mohamed Adra, a FBI language analyst, testified about the FBI's translation and certification process.  Mr. Adra testified that the FBI uses a three-step process for translating any document to be used in court.  One person translates it, a second reviews the original and the translation, and a third edits it.  In addition, if a fourth person is to testify about the document in court, that person will also have input as to the translation.

Mr. Adra also testified about his translation of several taped phone calls between Mr. Abu Ali and his parents while he was in Saudi custody.  On July 31, 2003, he testified that Mr. Abu Ali told his father, "My health is great.  Everything is fine."  During that call, his father asked why his son had not signed the Privacy Act waiver, and suggested that perhaps that was why he was still being detained.  Mr. Abu Ali replied, "Put your minds at ease.  Everything is fine."  Mr. Adra testified that in a phone call on November 22, 2003, Mr. Abu Ali's mother told him that anything said "under coercion . . . would not have any value in American courts."  Mr. Abu Ali asked, "Are you sure 100 percent?"  His mother replied, "We are sure."  Mr. Adra

testified that in a call on August 28, 2004, Mr. Abu Ali's father asked him "How is your hand?" and that Mr. Abu Ali answered, "My hand is like steel."  Mr. Adra also testified that on September 25, 2004, Mr. Abu Ali's mother was asking him about the length of his hair, then asked, "Did your fingernails come back?"  Mr. Abu Ali replied, "What are you talking about?"

**Nurse Merry Brinkley:**

Ms. Merry Brinkley, a registered nurse who works at the Alexandria Detention Center, testified about Mr. Abu Ali's medical examination when he was admitted to the facility on February 23, 2005, and his subsequent treatment.  Ms. Brinkley testified that she gave Mr. Abu Ali a health care examination - a "head-to-toe exam, to insure that [inmates] don't have any physical problems or mental" - on February 23, 2005, two days after he was booked into the Alexandria Detention Center.  At that time, Mr. Abu Ali told her he had no medical problems.  Ms. Brinkley said that when she examined his back she found acne on his back and shoulders, but did not observe any scarring.  On cross-examination, she said she can see marks on Mr. Abu Ali's back in photographs now, and that they look like they could be either striae or scars.  She observed an abrasion on Mr. Abu Ali's ankle, but he told her it was no problem.  He did not exhibit any rapid heart rate.  On cross-examination, she testified that Mr. Abu Ali told her the abrasion on his ankle was from leg shackles.

Ms. Brinkley described Mr. Abu Ali's demeanor during the exam as "compliant" and said that his vital and heart signs were normal, and that he did not tremble or make any startled reflexes.  Ms. Brinkley testified that Mr. Abu Ali told her nothing about being mistreated in Saudi Arabia, and she did not observe anything on his wrists that indicated he had been hung from a ceiling for ten hours.  On cross-examination, she testified that at the time she administered the exam, no one had told her of Mr. Abu Ali's claim that he was tortured while in Saudi custody.  Ms. Brinkley also testified on cross-examination that neither she nor the other health care workers who examined Mr. Abu Ali are psychologists or psychiatrists.  The only request Mr. Abu Ali made of Ms. Brinkley was that he be served a vegetarian diet, and that he would like to be served more desserts.

Ms. Brinkley also testified that since he has been admitted to the Alexandria Detention Center, Mr. Abu Ali has been given a physical exam every week.  She said that the only complaint Mr. Abu Ali has made about his physical condition during his entire stay at the Alexandria facility was during his first month, when he asked for chapstick because he had dry lips.

**Sylvia McCarthy:**

Ms. Sylvia McCarthy, a licensed practical nurse at the Alexandria Detention Center, testified about conducting a health care screening examination of Mr. Abu Ali when he was admitted to

the facility on February 21, 2005.  The purpose of such an exam is to determine whether an incoming inmate has any illnesses or diseases, so the detention center staff can treat them.  Other than telling Ms. McCarthy about an ankle abrasion from his leg shackles, Mr. Abu Ali had no complaints about his health.  Ms. McCarthy testified that he made no requests for special care. She also testified that Mr. Abu Ali appeared calm and was smiling when she saw him, and that she answered "no" to a series of questions on a mental health intake screening and assessment form pertaining to whether the inmate exhibited feelings of helplessness and hopelessness, or appeared overly anxious, unusually embarrassed, or ashamed.

On cross-examination, Ms. McCarthy said that her exam was a quick review of Mr. Abu Ali, intended only to catch major items. She said she was not aware that Mr. Abu Ali had been brought to the Alexandria Detention Center straight from his flight into the United States, or that he was blindfolded when he entered the facility.  Ms. McCarthy also stated that she has not had any training as either a psychiatrist or a psychologist.


**Dr. Robert Katz:**

Dr. Robert Katz graduated from George Washington University School of Medicine in 1961, had a residency in internal medicine and dermatology, and is board certified in dermatology and dermopathology.  He taught residents for 30 years at Walter Reed Army Medical Center, Bethesda Naval Hospital, and Georgetown

University.  He has published over twenty articles on dermatology and served as an expert witness and an expert consultant.  The Court certified Dr. Katz as an expert in dermatology.

Dr. Katz defined "scars" as alterations of connective tissues in response to injury or disease. He described hypertrophic scars as areas raised above the skin and atrophic scars as depressed areas.  Spread scars are thinned and atrophic. Most scars (i.e. approximately 75%) are hypertrophic.  Dr. Katz described a tissue wound as going through several steps, depending upon the severity of the injury.  These steps include external trauma, a break in the skin, bleeding, crusting, surrounding inflammation, redness, and tenderness.  The healing process would include scabbing, having the scab fall off, and finally a resulting scar.  The scar may be raised, depressed, wide, or narrow, but typically a scar has some dimension.

Dr. Katz did not examine Mr. Abu Ali.  Dr. Katz reviewed color photographs of Mr. Abu Ali's back and Dr. Allan Keller's report.  Dr. Katz reviewed Dr. Keller's report and offered his opinion concerning the photographs and Dr. Keller's findings. Dr. Katz noted that Dr. Keller referred to the marks on the defendant's back as "scars" but did not describe whether the scars were hypertrophic or atrophic, if there was thickening or flattening, and whether Dr. Keller actually palpated the scar. Dr. Keller only described a change in the pigmentation of the skin.  Dr. Katz noted that Dr. Keller did not describe a break in Mr. Abu Ali's skin or the location of the marks.  Dr. Katz

-48-

testified that it is very common to see hyper pigmentation and linear pigmentation in the skin and that such conditions could be caused by superficial breaks, scratches, or trauma.  He stated that individuals with darker complexions are more prone to hypertrophic scaring and that pigmentation would be increased in a person of Mr. Abu Ali's complexion.

Dr. Katz stated that if the marks were caused by whipping or other trauma they would have a period of crusting which would go on for a minimum of one and a half to four (4) weeks, and would be very painful and uncomfortable in response to pressure.  Dr. Katz stated that the marks on the defendant's back are not scars because they appear flat, and there is no depression, spreading, or thickening.  Dr. Katz concluded that it is unlikely that the marks on Mr. Abu Ali's upper back are scars from torture because the marks are all on the upper back, they are linear, parallel to each other, and there is no evidence of scaring.  Dr. Katz reviewed the photographs of Mr. Abu Ali and said that, in his medical opinion, the marks depicted are not scars.

Dr. Katz reported that a scar caused by whipping would bleed, then go through inflammation, redness, tenderness, crusting, scabbing, loss of the scab, and scarring.  This process could occur over a period from one and a half weeks to three (3) to four (4) weeks.  The scars would be uncomfortable to touch, and applied pressure would cause pain.  The Court notes that this information is significant because Mr. Abu Ali claims he was whipped on June 10 or 11, 2003 in Medina.  Witnesses from the FBI

-49-

who observed Mr. Abu Ali in the interrogation of June 15, 2003, did not observe Mr. Abu Ali guarding his back.  Mr. Abu Ali sat in a chair.  Mr. Machalany reported that Mr. Abu Ali fidgeted in the chair and did not grimace or show any signs of discomfort on his face.  Agent Posto observed Mr. Abu Ali enter the interrogation room without discomfort and sit in a chair with his back against the chair without showing any signs of discomfort. The Brigadier General and the Captain reported in their interrogations of Mr. Abu Ali on June 11, 12, that Mr. Abu Ali sat comfortably, rocked, and swivelled in his chair.  These reports are obviously inconsistent with how medical professionals would expect the victim of a vicious whipping on the back to be able to move his body.

On cross-examination, Dr. Katz admitted that he never specifically examines patients for torture and that he is not certified as an expert in torture.  He further admitted that he only looked at photographs of Mr. Abu Ali and did not personally examine him.  He admitted that he did not notice any markings on the defendant's lower back pointed out by defense counsel when reviewing the photographs, Gov't Exs. 36S, 35S, and possibly some other markings in the photographs, but these observations would not change his opinion.  Dr. Katz could not say that the marks did not come from whipping, but he thinks it is unlikely that they did.  Dr. Katz observed that scars incurred in a whipping like Mr. Abu Ali described would produce marks that likely criss-cross over each other, have differing patterns - some diagonal,

some linear - and he would expect marks to be on the whole back and neck as well.  Dr. Katz drew upon Dr. Saathoff's report about Mr. Abu Ali's statement that he was struck twenty or more times while chained to the floor in a crouching position with his full back and neck exposed.  Dr. Katz opined that, under these circumstances, he would expect to find marks on the full back, neck, mid-back, shoulders, and upper back as well.  Dr. Katz said Mr. Abu Ali's back in the photographs shows just four to seven linear parallel marks on the shoulders.  In any event, the marks are not thick or spreading, and there is no loss of hair pattern in the darkened skin pigmentation, or loss of skin line depicted in the photographs, as he would expect if these marks were wounds.

**Dr. Allen Keller:**

Dr. Allen Keller graduated from the New York University Medical School, performed his residency at Bellevue Hospital in internal medicine, served as chief resident, and is board certified in internal medicine.  He is currently the Chairman of the Bellevue Commission for Victims of Torture.  He has taken courses and seminars on treating victims of torture and routinely trains physicians in caring for victims of torture.  After his second year in medical school, he spent a year with a non-governmental organization working at a refugee camp in Cambodia working with torture victims.  He also worked for the government

with asylum seekers and with the State Department as an expert. The Court certified Dr. Keller as an expert in Internal Medicine.

Dr. Keller defined torture using the definition in the United Nations Convention Against Torture.[2]  Dr. Keller testified that torture is severe physical or mental suffering inflicted by a person acting in an official capacity in order to punish or to extract information or elicit behavior from an individual.  Dr. Keller also testified generally about the side effects, both physical and psychological, of torture.  He then explained that he begins his assessment by conducting a detailed history both of the individual's medical background and of the particular incidents of torture.  Then, Dr. Keller performs a physical examination to see if the findings are consistent with the victim's story.  Dr. Keller examined Mr. Abu Ali on April 20, 2005, at the Alexandria Detention Center.  He spent eight hours alone with the defendant and conducted a detailed history and physical exam.  He took Mr. Abu Ali's vital signs and did a dermatological, neurological, and neuromuscular exam.  He found the defendant to be in good health and that all tests were "grossly" normal.  With respect to his examination of the skin, he found abnormal findings resulting from injury or traumatic

---

[2] The United States of America is a signatory to the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (hereinafter "U.N. Convention Against Torture").  As a treaty adopted by the United States, this treaty is binding upon the federal courts and equivalent to the Supreme law of the land, the Constitution.  *See* U.S. Const. art. VI, cl.2.

events.  Dr. Keller stated that he saw approximately ten linear scars of approximately the same width (0.3 cm) and varying lengths (from 1.5-5.0 cm) on Mr. Abu Ali's back.  Dr. Keller palpated the scars that he observed on Mr. Abu Ali's back.  *See* Gov't Exs. 35-39S.  Dr. Keller defined the word "scar" to mean abnormal interruptions in the skin resulting from injury which may be intentional or non-intentional.  He described these darkened areas of skin as smooth or mostly flat.  Dr. Keller is of the opinion that these hyper pigmented areas are scars that are highly consistent with Mr. Abu Ali's report of torture.  Dr. Keller pointed out five (5) to seven (7) scars in Government Exhibit 35, two which he described as horizontal, and some non-trauma related stretch marks in Gov't Ex. 36.  Dr. Keller stated that some of the scaring on the defendant's lower back was due to stretch marks.  He identified two horizontal marks on Mr. Abu Ali's lower back that were not stretch marks and attributed them to whipping.

With respect to the detailed history, Dr. Keller reported that the defendant had no physical or psychological problems and reviewed Mr. Abu Ali's medical records.  Mr. Abu Ali reported that he was first tortured after the fourth or fifth interrogation in Medina during which he asked the Saudis for legal representation and the Saudi guards punched him in the stomach, blindfolded him, and handcuffed him in a squatting position.  Also, Mr. Abu Ali claimed that he was struck with a foreign object with his shirt both off and on.  Mr. Abu Ali was

-53-

not sure how many times he was struck, but stated that it was
many times, and probably was more than ten.  Mr. Abu Ali said it
felt like his back was stinging, and he could see blood on his
hands from the injuries on his back.  During the interrogations,
Mr. Abu Ali was told that if he did not cooperate, he would be
treated as an enemy combatant and would lose his hand, foot, or
be beheaded if he did not confess.  Mr. Abu Ali claimed that he
asked for a lawyer and was told the United States Embassy would
not help him.

In Riyadh, Mr. Abu Ali was repeatedly interrogated for
extended periods of time from approximately 8 p.m. to 4 or 6 a.m.
He was not beaten in these interrogations, but was threatened
with treatment as an enemy combatant.  Mr. Abu Ali was kept in
solitary confinement, but was fed three meals a day, and was
occasionally allowed to go outside for exercise.  Dr. Keller
testified that he believes the "sense of isolation and
intimidation" that Mr. Abu Ali experienced was part of his
mistreatment.

At one point, probably in September, 2003, after Mr. Abu Ali
was interviewed by the FBI, the Saudis told him that he
embarrassed them, and so they shackled Mr. Abu Ali with his arms
above his head and his feet touching the ground for a period of
several hours.  When the Saudis uncuffed Mr. Abu Ali's hands,
they were "tingling," felt "almost paralyzed," and Mr. Abu Ali
could barely move them.  According to Dr. Keller, Mr. Abu Ali
asked again if he could have a lawyer, and the Saudis took him to

a solitary cell where he was punched, kicked, slapped, and told
he would not get special treatment because he was an American.
Mr. Abu Ali told Dr. Keller he spent 30 days in solitary
confinement and then was transferred to another solitary cell
with no mattress, blanket, or pillow, and later he was moved to a
third cell with a shower and better accommodations.  Based on the
medical history and physical exam, Dr. Keller concluded that Mr.
Abu Ali suffered from depression and post traumatic stress
disorder ("PTSD") as result of torture.

Dr. Keller testified that there are varying degrees of PTSD,
and that Mr. Abu Ali suffers from the most severe form.  He said
that Mr. Abu Ali re-experiences the trauma of his confinement in
Saudi Arabia in the Alexandria Detention Center through triggers
in his environment, such as when a cell door opens, when he hears
guards walking by his cell playing with their handcuffs, or when
he hears the screams of a possibly intoxicated prisoner.    Dr.
Keller said that Mr. Abu Ali exhibits hyperarousal and is easily
startled.

Dr. Keller testified about malingering, the practice of
falsely stating events for some secondary gain.  Dr. Keller said
it is possible that Mr. Abu Ali is malingering, but that he
doubts that is the case.  He said that there are tests for
malingering, but that no one test is the "gold standard," and
that the study of determining malingering is "in its infancy."
On cross-examination, Dr. Keller stated that he has found "very
few" of the approximately 500 victims of torture he has treated

-55-

to be malingering. He also acknowledged that Mr. Abu Ali had a substantial interest in convincing him and the Court that he was tortured.

On cross-examination, Dr. Keller admitted that dermatology and psychology are different fields from internal medicine. He admitted that someone with a chance for secondary gain would have more incentive to lie about his injuries during the history and admitted that Mr. Abu Ali had a substantial amount to gain by lying. Dr. Keller admitted that he cares passionately about human rights and works as an advocate for torture victims. He is concerned about allegations that the United States government has abused detainees in the war on terrorism and opposed Attorney General Albert Gonzales's nomination. He lobbied members of Congress against Attorney General Gonzales and accused Mr. Gonzales of supporting the abuse of detainees in Guantanamo Bay, Cuba. Dr. Keller was a signatory to an amicus curiae brief to the United States Supreme Court in *Hamdi v. Rumsfeld*, 540 U.S. 1099 (2004).

Dr. Keller stated that he based his conclusion that Mr. Abu Ali was tortured on Mr. Abu Ali's statements, Dr. Keller's knowledge of the practices of Saudi Arabia, his physical exam of Mr. Abu Ali, and the fact that the defendant was forthcoming about instances where he was treated well. Dr. Keller admitted that Mr. Abu Ali did not say how many times he was struck on his back and could not say what he was struck with. Dr. Keller was not aware that prisoners in Saudi jails wear thobes, not shirts,

and stated that Mr. Abu Ali told him he was whipped with his shirt on and off.  Dr. Keller stated that he palpated the scars which were mostly smooth or flat, presented as hyper pigmented areas, and that these marks on Mr. Abu Ali's back are scars and highly consistent with torture. Dr. Keller observed that Mr. Abu Ali's skin lines were not disrupted, that there are one or two marks in Mr. Abu Ali's middle back, and that there are no marks that appear to criss-cross.

In response to the Court's questioning, Dr. Keller stated that Mr. Abu Ali was interrogated approximately five times before he was abused in Medina, and that the second time he was beaten was in mid-September 2003 when he was suspended by his arms.  The third incident of torture was in November 2004 when he was punched, kicked, and slapped by the Saudi prison guards.

Dr. Keller concluded that, based upon his examination, interviews with Mr. Abu Ali, and his expertise, Mr. Abu Ali suffers from PTSD and major depression as a result of being tortured.  He admits that he did not conduct any external inquiry or speak with detention center nurses or deputies to question visual observations of Mr. Abu Ali's behavior.  Dr. Keller says his judgment of Mr. Abu Ali's credibility is based upon his individual assessment of Mr. Abu Ali.

**Dr. Lynn Gaby:**

Dr. Lynn Gaby is an assistant professor of psychiatry at the George Washington University Medical Center and also works at the

Center for Multicultural Human Services, a non-profit organization, where she works with survivors of torture and severe trauma.  Upon motion by the defense, and without objection by the government, the Court recognized her as an expert witness in psychiatry.

Dr. Gaby testified for the defense about her April, 2005, examinations of Mr. Abu Ali and diagnosis that he suffers from PTSD and severe depression.  PTSD can result when something happens to a person that threatens life or limb, or when they witness such an event happen to another, and that event engenders feelings of "horror, helplessness, [and] fear."  Dr. Gaby testified that PTSD has three symptom clusters:  re-living of the event, hyperarousal, and avoidance or numbing.  Victims of PTSD may experience avoidance behaviors and may not want to talk about the traumatic event.  Trauma can affect a victim's ability to recount the event and his perception of time.

To evaluate whether a subject has PTSD, Dr. Gaby testified, she relies primarily on an interview with the person.  Dr. Gaby based her diagnosis of Mr. Abu Ali on three two-hour interviews she conducted with him at the Alexandria Detention Center in the spring of 2005, on April 19, April 26, and May 12.  Initially, she was told that she had only two hours with him.  At the conclusion of that session, she requested more time with him because, although she had "a sense" of Mr. Abu Ali's mental state, she did not believe she could render an opinion at that time.

Dr. Gaby testified that during their first visit, Mr. Abu Ali was "initially anxious" and "somewhat guarded," but that over the course of their two-hour visit he gradually appeared more comfortable and willing to expand on his experiences. Dr. Gaby attributed that change in his demeanor to the fact that she was non-threatening, and that she has experience interviewing a range of patients. Mr. Abu Ali subsequently told Dr. Gaby that he had been mistreated while in Saudi custody. Specifically, he told her he had been hit in the stomach, slapped, had his hair pulled, was handcuffed to the floor and whipped, and threatened with the amputation of a hand or foot or even beheading. She testified that Mr. Abu Ali told her that the mistreatment had stopped when he told his captors he would talk, and that he made that decision because he "just had to make it stop." Mr. Abu Ali also told her that, after initially refusing to cooperate with the FBI after their first meeting in September 2003, he was handcuffed to a chain hanging from a ceiling and left standing upright for perhaps as long as ten hours.

Dr. Gaby testified that she observed a range of symptoms of PTSD in Mr. Abu Ali. She said that she observed a pronounced feeling of shame in Mr. Abu Ali. Dr. Gaby also testified that she concluded in her report that he has an "excessive startle reflex" - that she witnessed him having a stronger than normal reaction to being startled by people passing outside the room where they met - and that he told her he is awakened and sits upright in bed whenever someone opens his cell door. He also

told her, "I don't feel like I can trust anyone."  Dr. Gaby

testified that although these are not necessarily "classic PTSD

symptoms," she was "able to draw them out" during her interviews

with Mr. Abu Ali.  Although Dr. Gaby said that Mr. Abu Ali does

not appear to have intense flashbacks, she believes that fact

supports her conclusion that he is not lying about his symptoms

because, if he were, he would probably describe "classic"

symptoms such as flashbacks.

By the end of the second session, Dr. Gaby concluded that

she felt certain that she could diagnose Mr. Abu Ali with PTSD

and that the traumatic event that triggered it was being

tortured, both physically and psychologically.  She testified

that because of the serious nature of the charges against him,

she decided to come back for a third visit and perform a

Clinician Administered PTSD Test (hereinafter "CAPS test"), which

Dr. Gaby testified is the "gold standard" for screening people

for PTSD and helps to determine whether a person might be

eligible to participate in clinical research trials.  Through the

CAPS test, Dr. Gaby sought to produce a quantitative measure of

the severity of Mr. Abu Ali's PTSD.  A score of 50 out of 136

points is the cutoff score below which a person is not selected

for participation in research trials.  Dr. Gaby testified that

she scored Mr. Abu Ali at 98, a "quite high score" indicating

that Mr. Abu Ali had severe PTSD.  The Court notes that the CAPS

test consists of the examiner asking the patient a series of

questions about the symptoms of PTSD and other conditions and

asks the patient to identify if he or she has experienced the symptom, and, if so, when and how often.

On cross-examination, Dr. Gaby testified that PTSD diagnoses are particularly susceptible to malingering - a person's attempt to fabricate a diagnosis for some secondary gain (e.g. financial gain or a favorable legal outcome).  On direct examination, Dr. Gaby testified that she was aware of the possible secondary gain for Mr. Abu Ali if he is diagnosed as suffering from PTSD, but that she is also aware of a possible secondary gain from her interviews with people seeking asylum in the United States.  Dr. Gaby testified that she never told Mr. Abu Ali that she had diagnosed him with PTSD.  Dr. Gaby testified on cross-examination that she does not "routinely do this work," and this was the first time she had examined someone charged with a felony and the first time she has testified in a federal court in a criminal case.  The government asked Dr. Gaby about two tests for malingering - the MMPI and Sears tests - and Dr. Gaby testified that they are not "gold standards," although they are widely used.  She did not use either test, and testified that the MMPI is used by psychologists, not psychiatrists.

Dr. Gaby testified on direct examination that Mr. Abu Ali initially had trouble remembering the dates and times of events, but that his version of the events themselves remained consistent.  She said that by their second visit, Mr. Abu Ali had "spent more time with his attorney" and was able to "get things clearer in terms of time and space."  In her report, Dr. Gaby

noted that Mr. Abu Ali's memory seemed to improve after talking to his lawyers about the events.  Dr. Gaby said that Mr. Abu Ali never indicated to her that his attorneys had told him the substance of events.

The government questioned Dr. Gaby at length about her reliance on her oral interviews alone to diagnose Mr. Abu Ali. Dr. Gaby acknowledged that she did not consult outside sources, but testified that not doing so is "standard clinical practice." She testified that she did not seek to interview staff of the detention center, including guards and nurses, because "it was quite clear to me that I was not in charge of the process," but noted that they are not trained mental health experts, and that their observations would likely not have been of much help to her.  Dr. Gaby also acknowledged that she did not review other records, consult outside collateral sources, or conduct psychometric testing of Mr. Abu Ali.

The Court notes that Dr. Gaby grew quite defensive on cross-examination and appeared to be a bit frustrated with the detailed questions about her findings.  Dr. Gaby apparently redefined the term "excessive startle reflex" on the stand during her testimony in a way that was not consistent with what she wrote in her report.  Question 17 of the CAPS test asked a question about hyperarousal symptoms and excessive startle reflex.  The CAPS test guide "Learn More" suggests consideration of medical or educational records, testing, and behavioral observations by collateral sources.  Dr. Gaby did not look at Mr. Abu Ali's back,

-62-

and she did not seek to explore any external sources such as prior medical reports of Mr. Abu Ali's physical condition when he was picked up by the United States in February 21, 2005, or booked into the Alexandria Detention Center.

### Ahmed Omar Abu Ali:

Mr. Ahmed Omar Abu Ali testified about the period from his arrest in Medina, Saudi Arabia, in June, 2003, through his return to the United States in February, 2005, and subsequent detention in the United States.

Mr. Abu Ali testified that in June, 2003, about ten minutes after he had started a final exam, a man in plain clothes entered his classroom and asked him for his identification.  He said that he believed the man was a member of the university staff, and showed him his ID.  The man asked Mr. Abu Ali to come with him. Outside the classroom were five people.  They took his wallet, address book, and cell phone.  He was led to a car, where he was handcuffed.  Mr. Abu Ali said he did not resist, but asked whether he was being arrested.  The people then took him to his dorm room, and the Arresting Officer told the others, "take everything."  Mr. Abu Ali was then led back to the car and driven to a detention facility.

At the detention facility he was photographed and then blindfolded.  Mr. Abu Ali testified that he asked, "What's going on?  Why am I being arrested?"  Mr. Abu Ali was repeatedly told, "You know why."  Mr. Abu Ali was taken to a room where Saudi

officials began to question him.  Mr. Abu Ali was blindfolded, shackled, and in handcuffs.

At first, Mr. Abu Ali said, he was not helpful.  He said that the first thing he asked for was to call the United States Embassy, an attorney, and his parents.  In response, he was told, "the Embassy is not going to help you - you have to help yourself."  At least four people questioned him in the room.  Mr. Abu Ali said he asked what his legal status was, but was told "you have to give your statement."  Mr. Abu Ali refused to speak to them.  On cross-examination, he testified that he "wanted the Embassy to be on notice that I had been arrested."

After an hour or two (Mr. Abu Ali was not wearing a watch, and all of his statements about the length of events while in detention are his own estimates), he was taken to a cell, still blindfolded, handcuffed, and in shackles.  The cell was completely empty - it had no bed, mattress, or other furniture. Mr. Abu Ali said "I just prayed to God - I didn't do anything." He was allowed to use a bathroom, where he drank from the faucet. After an hour or two, Mr. Abu Ali was taken back to the room, where he was questioned again.  This began a pattern in which Mr. Abu Ali "vaguely remember[s] that I would be taken back and forth from interrogation to the cell" for either four or five sessions of questioning during his first day of custody.  Mr. Abu Ali says the Mabahith continued to try to get him to talk.  He was told, "If you talk, we'll try to get you a lawyer, and let you call your parents."  He did not see any other inmates, but sometimes

he could hear other people yelling, which he took to be other inmates being beaten.

In the final session of the first day, Mr. Abu Ali's interrogators asked him whether he knew specific people, and whether he knew about bombings in Riyadh.   At one point in the last interrogation session of the first day, his blindfold was taken off.  Mr. Abu Ali said he then saw the bruised face of a man through a window in the door to the room.  The man was asked if he knew Mr. Abu Ali, and he shook his head no, then was taken away.  Mr. Abu Ali was not fed this day.  During that session, the Saudis began hitting him, slapping him, punched him in the stomach, and pulled his beard, ears, and hair.  After the last session, he was not allowed to use the bathroom, even when Mr. Abu Ali asked to wash up for prayers.

The next day, Mr. Abu Ali was again questioned.  Mr. Abu Ali testified that he told them he wanted to remain silent.  During that session, he testified, the Saudis continued hitting him.  He was asked, "Do you want a jury?"  He was then punched in the stomach.  At one point, he was taken from the chair in which he was sitting, and his handcuffs were handcuffed to a chain or other handcuffs in the floor, leaving him with his knees to his chest on the ground, hunched over with his head on his fists, and his feet shackled.  Then someone began to strike him on the back and to yell, "confess!"  He does not know what he was hit with, or how many times.  Although he was blindfolded, on cross-examination, Mr. Abu Ali said he could hear four different voices

in the room, and that he thinks he was assaulted by only one person.

Mr. Abu Ali said it was "very painful" and that it was the "first time I felt extreme pain." While he was being hit on the back, people in the room kept telling him to "confess." When the beating began, he was clad in an undershirt and long underpants. At one point, his undershirt was torn off and he was struck on his bare back. Eventually, Mr. Abu Ali told them he would cooperate. The beating stopped, and he was taken back to his cell.

During cross-examination, Mr. Abu Ali said he cannot remember what it felt like when he was hit and was unable to describe what type of instrument was used to strike him. He also testified that he could not move to avoid the blows because he was handcuffed to the floor.

On cross-examination, Mr. Abu Ali acknowledged that he told Dr. Saathoff that, although he does not know how many times he was struck, he was hit twenty (20) or more times. He said he gave this as an estimate only because the doctor kept pressing him to give a number, even a ballpark estimate. Mr. Abu Ali told Dr. Keller he was kicked in the stomach, but that, since he was on the ground cuffed with his knees to his chest, he may have been kicked in the ribs, not the stomach.

In the cell, his blindfold, handcuffs, and shackles were removed. Someone brought him clothes and dates, and he was allowed to use the bathroom. Mr. Abu Ali says someone told him,

"We're your brothers.  We don't want to hurt you."  Someone also brought a mattress, pillow, and blanket to his cell.  In the bathroom, he touched his back, and when he took his hand away, it had blood on it.  On cross-examination, Mr. Abu Ali said he does not remember if the surface of his back felt raised or not, but that he remembers it felt sore.  He also said that no doctor came to his cell, and that he had to sleep on his stomach for "a couple of weeks" because of the pain in his back.

Several hours later, he was taken to another questioning session.  This time, he was moved to the room without a blindfold, but he was still handcuffed and shackled.  One interrogator and a guard were in the room.  The man said, "Ahmed, you're our brother," and told him no one wanted to hurt him.  Mr. Abu Ali testified that he asked the interrogator, "How can you say this after [what you did]?"  The man replied, "I didn't do anything.  I'm here to help you."  Mr. Abu Ali testified that he answered the man's questions for three to four hours, then was taken back to his cell.  Nothing was written down during that session.  He was given a break in questioning for evening prayers, then returned to his cell.  Mr. Abu Ali testified that he felt "defeated" and "humiliated."  On cross-examination, he testified that about three or four hours passed between the time he was whipped and when he began cooperating.

On his third day of detention, the same interrogator again questioned Mr. Abu Ali.  This time, the questioning included writing down questions and answers.  Typically, the interrogator

would ask a question and Mr. Abu Ali would write down an answer.
At some point, he was told that, under Saudi law, his hand or
foot could be cut off - or that he could be beheaded - if he was
found to be associated with the Riyadh bombings.  Mr. Abu Ali was
also told at some point to prepare himself to travel.

In the late afternoon, Mr. Abu Ali was taken in a van to a
plane.  He was blindfolded, handcuffed, and shackled.  Mr. Abu
Ali felt that something was around him, but testified that he
could hear people around him talking, and felt that he was on a
commercial plane.

The plane took Mr. Abu Ali to Riyadh.  There, he was taken
to a prison outside of Riyadh.  Upon arrival, he testified he was
photographed and taken straight to a cell.  On cross-examination,
Mr. Abu Ali said he did not receive a medical exam upon arriving
at the Riyadh jail, and that any document purporting to be the
report of such an exam at 11 p.m. on June 10 is a lie.  The cell
was "actually decent," and had a bed, sink, and stool.  Dinner
was brought to him, and then he was taken to another room for
further questioning.

After about a ten-minute walk, he entered a room and his
blindfold was removed.  He found himself in a conference where
the Captain and the Brigadier General were present.  Mr. Abu Ali
said he asked, "Why have I been transferred here?  I already told
you everything."  The Captain answered, "We don't believe you."

Mr. Abu Ali says he again asked to call the Embassy, an
attorney, and his parents, but was told, "No one knows where you

are.  You have to cooperate."  So, Mr. Abu Ali said, "I started

talking."  Mr. Abu Ali denies telling the Brigadier General or

the Captain that he was afraid of being returned to the United

States.  The interrogation session lasted about five hours.  At

some point, Mr. Abu Ali told a pharmacist he had cuts and bruises

on his back when he got to the prison.  He was given painkillers,

but no other treatment.  After the questioning, Mr. Abu Ali was

returned to his cell, and he went to sleep.

Mr. Abu Ali testified that for about a month, he was

interrogated every night, both orally and in writing.  He

described that month as "very intense."  Although he would

sometimes say, "I have given you everything," he said "I couldn't

resist."  Also, "Riyadh wasn't as bad as Medina," because he

wasn't beaten and the food was much better.  Mr. Abu Ali

testified that "As you cooperate, it just gets better."  On

cross-examination, Mr. Abu Ali testified that he was never struck

during interrogation sessions in Riyadh, although he was

sometimes shackled.  He received three meals per day and was

allowed to pray five times per day.

On cross-examination, Mr. Abu Ali testified about the July

8, 2003, visit of consular officer Charles Glatz.  He said that

he did not tell Mr. Glatz that he was mistreated.  Asked why he

did not try to send a "distress signal" to Mr. Glatz, Mr. Abu Ali

said that when he told Mr. Glatz that he wanted to be "treated

like an American," that was his "distress signal."  Mr. Abu Ali

said that he asked to meet privately with Mr. Glatz, but that the

Saudis told him "no."  Mr. Abu Ali also testified that Mr. Glatz
told him, "I hope you're not one of those people who want to
break my neck."  Mr. Abu Ali says he told Mr. Glatz he was being
treated "excellent, kind, and humane" while the Mabahith official
was observing the visit.

Mr. Abu Ali acknowledged on cross-examination that he lied
to Mr. Glatz during the consular visits when he said he not been
mistreated.  Mr. Abu Ali testified that he considered telling him
about his mistreatment when he was once alone with Mr. Glatz for
about five seconds, but that he did not because, "It's not as
easy as you think it is."

On redirect examination, Mr. Abu Ali testified that it
seemed like the consular officer could not do anything to help
him.  Although Mr. Glatz once brought him a book and some
newspapers, he was unable to give Mr. Abu Ali a pen and paper.
He said that during his consular officer visit with Mr. Gilbert
Sperling, Mr. Abu Ali mostly just listened to Mr. Sperling.
During his consular officer visit with Mr. Hankins, Mr. Abu Ali
testified that when he told Mr. Hankins about his parents'
lawsuit and the possibility that he would be able to go home, Mr.
Hankins said, "I don't know about that."

In September, 2003, he was visited in the Saudi prison by
FBI Special Agent Barry Cole.  Mr. Abu Ali testified that Agent
Cole brought him a letter from his parents and a picture of his
little brother, and told him that if he wanted to see his brother
again, he would have to cooperate.  Mr. Abu Ali also said that

Agent Cole told him that Saudi Arabia was different from the United States, and that there was no bureaucracy to go through. Mr. Abu Ali testified that he told Agent Cole he wanted a lawyer. Later that evening or morning, the Mabahith officers told him that he was embarrassing them by not cooperating with the FBI. Mr. Abu Ali reiterated that he refused to cooperate, and told the Mabahith, "This is between me and my people.  You have nothing to do with it."

On cross-examination, Mr. Abu Ali testified that he said that he did not say anything to Agent Cole the first night about being mistreated even though they were alone because Agent Cole "threatened" him.  He also testified that during one meeting he did tell Agent Cole that he had been mistreated, to which Agent Cole replied, "Oh yeah?  I'm going to ask the General," then left the room and never returned.

That night, Mr. Abu Ali says, he was taken from his cell in the general population area of the prison to a solitary confinement cell.  There, he was handcuffed to a chain hanging from the ceiling and left standing up until the afternoon.

Mr. Abu Ali was not questioned on the day after this incident he says.  He testified that, the following day, Agent Cole returned with Agent Luke Kuligoski.  Mr. Abu Ali says he again asked for a lawyer and they told him he had three options: (1) be tried in Saudi Arabia and be sentenced to life in prison, (2) be tried in Saudi Arabia and in the United States, or (3) be designated an "enemy combatant."  Mr. Abu Ali says that Agent

Kuligoski told him that, if he cooperated, they would try to get him back home.

On cross-examination, Mr. Abu Ali testified that on the third night of questioning by the FBI officials, Agent Kuligoski offered to take a letter from Mr. Abu Ali back to his parents, if he wanted to write one.  Mr. Abu Ali wrote a letter, and Agent Kuligoski read it and saw a sentence about Mr. Abu Ali being in prison.  At that point, Agent Kuligoski said, "We're going to try to get you home."  Mr. Abu Ali said on cross-examination that he then added a sentence to the letter about Agent Kuligoski being a "great person."  He also wrote, "I am under no pressure," of his own volition simply because he decided to write it.  At one point, Mr. Abu Ali was questioned by the Brigadier General in a room with a one-way mirror for about 15 minutes.  During the questioning, the Brigadier General left, then came back with papers in his hand.

On cross-examination, Mr. Abu Ali acknowledged telling Mr. Glatz in October 2003 that he preferred to be tried in Saudi Arabia, not the United States.  He also acknowledged asking Mr. Glatz in November 2003 about renouncing his United States citizenship.  He said that following his visit with the FBI in September, he was "in an identity crisis" because although he told them about being tortured, they "didn't care."  Mr. Abu Ali said, "I wanted a way to get out of prison.  That's all I want." He also testified that the Saudis had stopped torturing him, and that he had no legal counsel and did not know what to do.  In

-72-

addition, Mr. Abu Ali testified that the Saudi warden kept telling him Mr. Abu Ali's problem was "his blue passport" - his American citizenship.  Mr. Abu Ali said that the warden told him his case could be resolved more easily if he was not a United States citizen.

When asked on direct examination about his video confession, Mr. Abu Ali testified that he did not know he was being videotaped at the time.  Having since seen the video, he said he "can't explain" the video, because "that's not how I behave," and "I look like I'm going nuts."  On cross-examination, Mr. Abu Ali acknowledged that during the video, without Mabahith direction or orders, he spontaneously ad libbed about how he had not learned to conceal his identity as a joke and pantomimed the action of racking an assault rifle.  On re-direct examination, Mr. Abu Ali testified that he had been interrogated every night for about forty-seven (47) nights, and that he was very tired.  In addition, before that session he was told by the Saudis that he was going to be transferred to the general population, and that reading the statement was one of the last things he would have to do.  Mr. Abu Ali said, "I was looking forward to it.  When you're in prison, everything is relative . . . you stop thinking how you would in the outside world."  He said that just ending the interrogation was a "big relief."

On cross-examination, Mr. Abu Ali acknowledged that once he was on the FBI plane about to leave Saudi Arabia, he was given a medical examination.  He also said that, although no Mabahith

officials were on board, he did not tell the doctor about his mistreatment.  Nor did he tell anyone during the lengthy flight to the United States about his abuse in Saudi custody.  Mr. Abu Ali said "It's none of their business."  On redirect examination, Mr. Abu Ali said that he did not tell anyone on the flight back to the United States about his mistreatment in Saudi custody because they were FBI officials, so "I didn't want to say anything to them.  All I really cared about was that I was going home.  I didn't really even care about the charges at that time."

### Dr. Gregory Saathoff:

Dr. Gregory Saathoff, a psychiatrist who is a consultant to the FBI, testified about his examination of Mr. Abu Ali in September 2005 to evaluate his mental state and determine whether he suffers from PTSD or depression.  He testified that on September 10 and 11 of 2005, he visited Mr. Abu Ali in the Alexandria Detention Center five (5) times, for a total of eleven and a half (11.5) hours.  Dr. Saathoff concluded that Mr. Abu Ali does not suffer from PTSD or any other mental illness.

Dr. Saathoff testified that to effectively diagnose PTSD, it is important to review all the data he can obtain in addition to his own notes because a diagnosis of PTSD is almost entirely dependent on a person's subjective self-reporting.  He testified that in addition to meeting with Mr. Abu Ali, he reviewed information from the Alexandria Detention Center and interviewed guards and nurses there.  In contrast to Dr. Gaby's testimony,

-74-

Dr. Saathoff testified that not only psychiatrists can recognize startle responses.  He also testified about a range of observations made by prison staff, such as that Mr. Abu Ali was smiling when he first arrived at the Alexandria facility, that he was jovial within a few days, and that he was very engaged in his environment.  Although Dr. Gaby's report indicated that Mr. Abu Ali said he was very fearful of the guards because they remind him of his Saudi captors, Dr. Saathoff said that guards told him in his interviews that Mr. Abu Ali chats with them, gets along with them, and asks favors of many of them - he even asked one guard for legal advice.

Dr. Saathoff also noted some inconsistencies in Mr. Abu Ali's account of his mistreatment, such as not mentioning that his ears were pulled, even when the doctor asked him to be as specific as possible about his mistreatment.  He also testified that it is not unusual for inmates in solitary confinement to feel some of the symptoms of PTSD, such as a sense of detachment. In addition, Dr. Saathoff testified that a psychiatrist cannot completely rule out malingering in a PTSD diagnosis based on a person's report of feeling shame alone, since inmates may feel shame for a variety of reasons.  Dr. Saathoff concluded that is was his opinion that Mr. Abu Ali does not suffer from PTSD.

**II. DISCUSSION**

**Motion to Suppress**

    **(1) "Involuntariness of Statements"**

    **Standard of Review**

    The government has the burden of proving that a defendant's statement is voluntary by a preponderance of the evidence at a pretrial suppression hearing.  *United States v. Dodier*, 630 F.2d 232, 236 (4th Cir. 1980) (citing *United States v. Johnson*, 495 F.2d 378, 382-83 (4th Cir. 1974)).  A statement is "involuntary" under the Fifth Amendment only if it is "involuntary" within the meaning of the Due Process Clause.  *See Oregon v. Elstad*, 470 U.S. 298, 304 (1985); *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997).  For a statement to be involuntary under the Due Process Clause, it must be "extracted by . . . threats or violence", or "obtained by . . . direct or implied promises" or "the exertion of . . . improper influence."  *Hutto v. Ross*, 429 U.S. 28, 30 (1976); *Braxton*, 112 F.3d at 780 (citing *Hutto*, 429 U.S. at 30); *accord Colorado v. Connelly*, 479 U.S. 157, 165 (1986).  "A confession is involuntary and subject to suppression when induced by such duress or coercion, express or implied, that the accused's 'will has been overborne and his capacity for self-determination critically impaired.'" *United States v. Wertz*, 625 F.2d 1128, 1133-34 (4th Cir. 1980) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)).  Statements by an accused that are not "'the product of a rational intellect and a free

will'" are inadmissible as evidence.  *Id.* (quoting *Mincey v. Arizona*, 437 U.S. 385, 398 (1978)).

In the Fourth Circuit, to determine whether a statement is "involuntary," courts must examine the "totality of the circumstances," including a defendant's individual characteristics and background, the setting in which the statement was obtained, and the details of the interrogation or interview.  *See Haynes v. Washington*, 373 U.S. 503, 513-14 (1963); *Braxton*, 112 F.3d at 781; *United States v. Elie*, 111 F.3d 1135, 1143-44 (4th Cir. 1997); *Wertz*, 625 F.2d at 1133-34.  Among the factors that courts may consider are (1) whether the officer conducting the interrogation harmed or threatened to harm the defendant if he or she did not answer the officer's questions, (2) whether the officer deprived the defendant of anything, (3) whether the defendant was subjected to a lengthy period of interrogation or isolation, and (4) whether the officer tried to deceive the defendant.  *See Elie*, 111 F.3d at 1143 (internal citations omitted).

### **Analysis**

The Court finds that the government has demonstrated by a "preponderance of the evidence" that any incriminating statements allegedly made by the defendant were "voluntary" and not the result of "gross abuse" or "inherently coercive conditions" and therefore that the statements are admissible evidence for trial.

The Court finds that the incriminating statements allegedly made by the defendant were voluntary based on the "totality of the circumstances" after:  having held a full 5-day pretrial suppression hearing outside the presence of a jury; having heard eight (8) days of Rule 15 foreign witness deposition testimony; having heard four (4) days of in-court testimony; and having thoroughly considered the written submissions and arguments of the government and defense counsel.

<u>The Government's Evidence of Voluntariness.</u>

The government presented witness testimony and other evidence that support a finding that Mr. Abu Ali's statements were voluntary and not the product of torture.

First, the Court finds that the testimony of the Arresting Officer and the Lieutenant Colonel, who is the Warden at the Medina detention facility, that Mr. Abu Ali was not tortured or abused is credible.  Mr. Abu Ali and the Arresting Officer's testimony coincide in many respects prior to Mr. Abu Ali's detention in the Medina facility.  The Lieutenant Colonel was questioned extensively by the government and by the defendant's counsel about any torture or abuse of Mr. Abu Ali at the Medina facility.  This critical issue is a contested fact in the defendant's Motion to Suppress.  The Court has considered Mr. Abu Ali's testimony that he was abused at the Medina facility and, as explained below, the Court finds that the Lieutenant Colonel's

testimony is unimpeached while the testimony of Mr. Abu Ali raises questions that bear on the defendant's credibility.

Second, while no one expects that the Saudis would admit to torturing Mr. Abu Ali, the Court finds that the testimony of the Captain and the Brigadier General that Mr. Abu Ali was not tortured or abused while in custody in Riyadh is credible as well.  The Court finds that the Brigadier General's testimony that the interrogation of Mr. Abu Ali was conducted in the absence of threats or torture is credible.  Mr. Abu Ali does not claim that he was tortured or threatened into giving statements during the interrogation in Riyadh, and the Brigadier General's testimony that he obtained these statements by winning Mr. Abu Ali's confidence and alleviating his fears seems credible to the Court.  Likewise, the Court finds the Captain's testimony concerning Mr. Abu Ali's physical condition, the nature of the interrogation, and the absence of threats or torture against the defedant to be credible.  The Captain denies using force against Mr. Abu Ali or observing or being aware that Mr. Abu Ali had been abused.  The Court credits this testimony and notes that Mr. Abu Ali did not accuse the Captain of torturing him prior to securing the statements at issue in the instant Motions.

Third, if one carefully reviews the testimony of the Arresting Officer, the Brigadier General, the Captain and the FBI agents, Mr. Abu Ali's claim about having been whipped to the point of having blood on his back seems implausible in light of certain behaviors that he exhibited in the time frame of June 11

through 15, 2003 - immediately after the alleged whipping - that
do not coincide with how a recently beaten person would behave.
The Captain and the Brigadier General reported that Mr. Abu Ali
moved freely during the June 11 and 12, 2003, interviews.  Also,
U.S. law enforcement personnel observed Mr. Abu Ali on June 15,
2003, and did not observe any noticeable discomfort or
limitations in Mr. Abu Ali's mobility.  Mr. Abu Ali testified
that after his brutal whipping, he was in such pain that he had
to sleep on his stomach for two weeks.  Well, two weeks after the
whipping of June 9 or 10, 2003, would certainly include June 15,
2003, and all of the evidence points to the fact that Mr. Abu Ali
was not experiencing the pain that he now claims.

Finally, The Brigadier General and the Captain both
testified that during the June 11 and 12, 2003, interviews, Mr.
Abu Ali was primarily concerned with ensuring that the United
States did not know that he was in custody.  The FBI language
specialist, Mr. Machanaly, reported that when Mr. Abu Ali entered
the Saudi interrogation room for the June 15, 2003, interview,
which the FBI and Secret Service were permitted to observe, the
first thing Mr. Ali said was, "Did you tell the Americans I am
here?"  Mr. Machanaly heard the Brigadier General reassure Mr.
Abu Ali that the Saudi Government had not informed the United
States of his arrest.  It stretches credibility to think that a
United States citizen who had just been beaten and tortured days
before by foreign law enforcement officials would *not* want the
United States to know that he was in custody abroad and was being

tortured.  This, too, raises serious questions about Mr. Abu
Ali's claims of torture.

In sum, when the Court considers the quality of the evidence
offered surrounding Mr. Abu Ali's interrogation, the Court finds
that the government has met its burden of proof by a
preponderance of the evidence that the statements at issue were
voluntary and are therefore admissible.


The Defendant's Claim of Torture.

The Court has taken notice of the defendant's allegations of
torture and, if it could fully credit the defendant's testimony,
the Court would find that the defendant was, in fact tortured.
In that instance, the Court would rule that the resulting
statements were involuntary.  However, the Court heard a great
deal of evidence during the suppression hearing and was able to
judge the credibility of the witnesses who testified therein,
including the defendant Mr. Abu Ali, and many questions remain
about the defendant's allegations of torture.

The Court has carefully and deliberately weighed all the
evidence presented by Mr. Abu Ali which supports his claim that
he was tortured by the Saudi Mabahith and that he gave false
confessions.  The Court, with great respect for Mr. Abu Ali's
physicians, concludes that, based upon the quality of the
evidence presented, together with the difficulty of assessing a
diagnosis that is based primarily upon the patient's own self-
reporting, the Court cannot accept the diagnosis of Mr. Abu Ali's

-81-

physicians without reservations.  In the end, judges, not
physicians, have to make the ultimate determination of the
credibility of all of the testimony.

Many questions remain concerning Mr. Abu Ali's story about
torture.  For example, there is a substantial dispute between the
medical professionals about whether the marks on Mr. Abu Ali's
back are scars from torture or whether these marks are simply
pigment discolorations.[3]  Dr. Keller, Mr. Abu Ali's expert
internist, said that he observed about seven to ten scars on Mr.
Abu Ali's back which, in his view, evince scars from the beating
Mr. Abu Ali claims he suffered during interrogation in Medina.

Conversely, Dr. Katz, the government-retained expert
dermatologist, offered a more guarded opinion.  Dr. Katz observed
vivid court photographs of Mr. Abu Ali's back and the marks
depicted therein.  Dr. Katz testified that a scar is an
interruption of the skin which may be caused by intentional or
non-intentional trauma.  Dr. Katz stated that, in his opinion,
the marks depicted on Mr. Abu Ali's back in the photograph were
not scars.  Dr. Katz also stated that a scar will usually show
some depression or elevation, and he noted that the marks on Mr.
Abu Ali did not show elevation or depression in the photographs.
In contrast, Dr. Keller actually palpated Mr. Abu Ali's skin and

---

[3] The Court is well aware that, in some instances,
individuals who are tortured do not show significant objective
evidence or signs of torture.  In this case, the Court has been
sensitive to that fact, and, as such, has made its findings of
fact concerning Mr. Abu Ali's allegations of torture based on *all*
of the evidence presented thus far.

he said the skin containing the marks was smooth, not elevated or depressed.

It is important to bear in mind that Dr. Katz did not examine Mr. Abu Ali.  Dr. Katz reviewed color photographs of Mr. Abu Ali's back and Dr. Keller's report.  Dr. Katz reviewed Dr. Keller's report and noted that Dr. Keller referred to the marks on the defendant's back as "scars" but did not describe the scar. Dr. Keller made no determination about whether it was hypotrophic or atrophic, that is if there was thickening or flattening. Further, when Dr. Keller actually palpated the scar, he only described a change in the pigmentation of the skin.  Dr. Katz noted that Dr. Keller did not describe a break in Mr. Abu Ali's skin or the location of the marks.  Dr. Katz testified that it is very common to see hyper pigmentation and linear pigmentation in the skin and that such conditions could be caused by superficial breaks, scratches, or trauma.  Dr. Katz stated that darker complected individuals are more prone to hypertrophic scarring and that pigmentation would be increased in a person of Mr. Abu Ali's complexion.

Dr. Katz stated that if the marks were caused by whipping or other trauma, they would have a period of crusting which would go on for a minimum of one and a half (1.5) to four (4) weeks, and would be very painful and uncomfortable in response to pressure. Dr. Katz stated that the marks on the defendant's back are not scars because they appear flat, and that there is no depression, spreading, or thickening.  Dr. Katz concluded that it is unlikely

that the scars would result from torture because they are all on the upper back and not on his neck or side, they are linear, parallel to each other, do not criss-cross, and because there is no evidence of scarring.

Dr. Katz reported that a scar caused by whipping would bleed, then go through inflammation, tenderness to the touch, crusting, scabbing, lose the scab, and finally scar.  This process could occur over a period from one and a half (1.5) weeks to three (3) to four (4) weeks.  The scars would be uncomfortable to touch and applied pressure would cause pain.

These disparate medical opinions, coupled with the Court's assessment of the Saudi officials' statements and Mr. Abu Ali's testimony, preponderate in favor of the government's evidence that Mr. Abu Ali's statements were voluntary.  The Court notes that this dichotomy in medical information is significant because Mr. Abu Ali claims he was whipped on June 10 or 11, 2003, in Medina.  Witnesses from the FBI who observed Mr. Abu Ali in the interrogation of June 15, 2003, did not observe Mr. Abu Ali guarding his back or exhibiting any facial expression consistent with pain.  According to FBI Agent Posto, when Mr. Abu Ali entered the interrogation room he walked with a full gait, spoke without seeming discomfort to the Brigadier General and Captain, and readily followed directions to sit in a chair.  Mr. Machalany, the FBI language analyst, reported that Mr. Abu Ali sat and fidgeted in the chair.  Mr. Machalany reported that Mr. Abu Ali did not grimace or show any facial signs of discomfort.

The Brigadier General and the Captain reported, in their interrogations of Mr. Abu Ali on June 11 and 12, 2003, that Mr. Abu Ali sat comfortably, rocked, and swivelled in his chair.

These reports concerning Mr. Abu Ali's condition are obviously inconsistent with what the medical professionals would expect of a victim of a vicious whipping on the back.  It is doubtful that a person with welts, bruises, or tender scars on his back would be able to move his body in such a way that he rocks his back against, or swivels around in, a chair.

The Court has additional observations about Mr. Abu Ali's behavior that cause the Court to question the reliability of the evidence.  The issue of whether Mr. Abu Ali has manifested additional evidence of torture requires consideration of Dr. Lynn Gaby and Dr. Keller's opinion that Mr. Abu Ali suffers from PTSD as a result of torture in Saudi Arabia.  The Court has considered this testimony and the testimony of Dr. Richard Schwartz and Dr. Gregory Saathoff as well.  Dr. Saathoff concludes that Mr. Abu Ali does not suffer from PTSD and that Mr. Abu Ali is malingering.  Dr. Schwartz conducted the physical examination of Mr. Abu Ali's whole body on the airplane on February 21, 2005, and he did not observe any significant marks he would characterize as scars on Mr. Abu Ali's back.  Dr. Schwartz works as a government consultant, and he is an emergency medicine physician.  Emergency medical physicians deal with trauma of all types on a daily basis, have to be observant to physical conditions, and have to render snap diagnoses and treatment.

This is a very difficult factual question to resolve, and the Court, with due respect for the professionals involved, must reach an independent evaluation of the quality of the evidence and make an independent judgment about whether this evidence corroborates Mr. Abu Ali's claim of torture.  The Court is not persuaded that it should accept Dr. Gaby and Dr. Keller's diagnosis as the final judgment on the issue of torture for the following reasons.

First, the nature of the diagnosis of PTSD relies very heavily upon the reporting ability of the patient.  Dr. Keller and Dr. Gaby admit that their opinion that Mr. Abu Ali suffers from PTSD is substantially based upon their interviews with Mr. Abu Ali and his self reporting of his condition.  The Court has had the opportunity to consider Mr. Abu Ali's demeanor, his ability to recall facts, to answer questions, and Mr. Abu Ali's behavior in the courtroom.  Mr. Abu Ali is an intelligent, well-educated man with a rich and graphic vocabulary.

The Court notes that Dr. Gaby reported in her medical report that Mr. Abu Ali seemed at times to be reporting to her things that his lawyer told him about the case.  Dr. Gaby reports that, in her first interview with Mr. Abu Ali, he had difficulty recalling events.  However, after, Mr. Abu Ali spent some time with his lawyers, prior to Dr. Gaby's next visit, it appeared to her that Mr. Abu Ali was relying upon what his lawyers told him, and his ability to recall things improved.

Dr. Gaby admits that she set forth in her report the basis for her findings. The Court notes that in the court hearing, Dr. Gaby's testimony was slightly, but significantly, distinct from her report concerning the observable behavior of Mr. Abu Ali. While the Court credits Dr. Gaby as a skilled clinician, the Court was left wanting concerning several of her answers to basic questions about the basis for her diagnosis. Dr. Gaby seemed to discount entirely the ability of detention center nurses or deputies to report Mr. Abu Ali's observable behavior. For example, Dr. Gaby reports that Mr. Abu Ali has a startle reflex when events happen suddenly in his environment. This finding is based on Dr. Gaby's observation that when people walked by in the halls behind the interview room, Mr. Abu Ali looked around and held his glaze longer than she might anticipate. She denied that a nurse who saw Mr. Abu Ali weekly would not be able to report valuable information about whether Mr. Abu Ali jumped around, or moved swiftly as if he was "startled" when the jail cell door opened.

Likewise, Dr. Gaby reported that Mr. Abu Ali did not interact much with detention center guards because they reminded Mr. Abu Ali of his former Saudi captors. However, Dr. Saathoff produced reports from Detention Center deputies who interact daily with Mr. Abu Ali that seem contrary to what Dr. Gaby reported about Mr. Abu Ali's interaction with authorities. For all of these reasons, Dr. Gaby's inquiry into Mr. Abu Ali's condition was deficient in the Court's view.

Likewise, Dr. Keller's evaluation, while seemingly more extensive, at bottom, relies substantially upon the ability of Mr. Abu Ali to self report.  Dr. Keller is an internist with considerable experience with investigations of torture and human rights violations.  Although the Court is not familiar with him or his work, he appears to be well-regarded.  Dr. Keller's definitive judgment that the marks on Mr. Abu Ali's back are scars bears greater scrutiny.  While some of the things the Court will point out may seem picky or inconsequential, as a fact finder, this level of attention to detail bears on its final judgment.

Dr. Keller's report does not describe the location of the scars, or their dimensions in terms of depth or height.  Despite the fact that the Court, in response to an "Emergency Motion" filed by the defense, authorized the doctor conducting the physical examination of Mr. Abu Ali to document any physical marks or to videotape or photograph Mr. Abu Ali during his examination, Dr. Keller did not make such a record.  In any event, this Court cannot accept Dr. Gaby and Dr. Keller's PTSD diagnosis alone as sufficient evidence of torture because of the significant questions that remain about the nature of the reports and testimony of the physicians, the fact that the findings of PTSD rely primarily upon Mr. Abu Ali's self reports, and because of his significant secondary gain issues.

Also, Mr. Abu Ali's own testimony and his demeanor cause the Court some reservations.  It is not uncommon for the victim of

such horrors to have difficulty recalling details of the event, or to put them out of their mind.  However, while Mr. Abu Ali dramatically recounted a brutal beating and humiliating treatment, it is noteworthy that Mr. Abu Ali could not recall, even by texture, shape, or dimension, what hit him.  Was it a cylinder? Belt? Whip? Stick? Baseball bat?  Of course, he was blindfolded and chained to the floor when the beating allegedly occurred so he may not know the exact item used to hit him.  However, it seems to the Court that he could, at the very least, provide some basic description of what the item might have been based on how it felt to him.

The Court has already said that it finds that Mr. Abu Ali is intelligent, capable, and articulate.  The Court cannot discern whether Mr. Abu Ali is sincere or just cunning.  Mr. Abu Ali's testimony agrees with the Arresting Officer up to his arrival at the Medina jail.  Also, Mr. Abu Ali agrees in part with the Brigadier General and the Captain about certain key moments during the interrogation.

Some aspects of Mr. Abu Ali's testimony, in the Court's view, just do not flow logically.  For instance, if he was interrogated in Medina and he confessed, it seems to the Court that the Medina officers transporting Mr. Abu Ali to Riyadh for additional questioning would bring the notes of the interrogation so the next set of questioners could refer to and use them to contradict the suspect during questioning.  It also seems to the Court that the new interrogators would want to know what

statements were already obtained so they could build upon them.
Mr. Abu Ali testified that the Riyadh interrogators did not have
the statement log from Medina, and they started questioning him
all over again as if they knew nothing.  The Brigadier General
and the Captain said they did not have any indication Mr. Abu Ali
was previously questioned or tortured.  The Brigadier General and
the Captain said they set out in the initial meetings trying to
win Mr. Abu Ali's confidence so he would talk.  The Brigadier
General and the Captain say they started out the initial
questioning of Mr. Abu Ali by telling him that he was being
investigated for the Riyadh bombings and any association with Al-
Qaeda, and reassuring him that they would not turn him over to
the Americans.

        The Court has to accept some of what Mr. Abu Ali says at
face value.  On that basis, one can understand why he would not
tell United States consular officers at any time about his
complaints.  If he felt they could not get him a piece of paper
and a pen, it is no wonder he had little confidence that, if he
made a report of torture, any good would come of it.  However,
during his testimony, there were times where Mr. Abu Ali seemed
to deflect the question.  Mr. Abu Ali testified to the effect of,
"The consular officers asked me was I being abused?"  The Court
noted that once or twice Mr. Abu Ali's responses sounded as if he
interpreted the Consul's questions about abuse or mistreatment to
mean "Were you mistreated today?" as opposed to in the past or
generally.  It seems unlikely that one who had experienced any of

the torture claimed by Mr. Abu Ali would be so coy in making such a distinction.

In sum, the Court is left with lingering questions concerning the credibility of Mr. Abu Ali and his claim that he was tortured.  In making its determination that the incriminating statements allegedly made by the defendant are voluntary and therefore admissible, the Court notes that it is not making a judgment that the defendant is guilty or that the defendant has been untruthful in any way; only that the government has met its burden of showing by a preponderance of the evidence that the incriminating statements were made voluntarily.

However, this does not end the matter because, under the law, the Court's ruling today empowers Mr. Abu Ali to present admissible evidence on the issue of the voluntariness of the statements and his claim of torture to the jury as a contested question of fact.  Under Fourth Circuit law concerning federal prosecutions, the issue of voluntariness concerning the incriminating statements will ultimately be submitted for determination by the jury, and the defense and the government are free to argue the issue to the jury at that juncture.  *United States v. Inman*, 352 F.2d 954, 956 (4th Cir. 1965) (prescribing the "Massachusetts Doctrine" for determining the voluntariness of confessions in federal prosecutions in the Fourth Circuit, a rule requiring that the issue of voluntariness ultimately be submitted to a jury); *accord Morris v. Boles*, 386 F.2d 395, 402 (4th Cir.

1967).  Ultimately, the jury will have to resolve this very
perplexing question.

### Torture Will Not Be Tolerated in the American Justice System

Due to the serious nature of the allegations of torture and
mistreatment being made by the defendant, the Court would like to
make a very clear statement that torture of any kind is legally
and morally unacceptable, and that the judicial system of the
United States will not permit the taint of torture in its
judiciary proceedings.  This Court takes very seriously its
solemn duty and unwavering responsibility to ensure that the
human rights guarantees of the United States Constitution and of
those international documents on human rights to which the United
States is a signatory, including the U.N. Convention Against
Torture, are upheld in word, deed, and spirit.

The Supreme Court has, in a number of cases, articulated the
outer limits of coercive government behavior and has stated very
clearly that such coercion is impermissible under the United
States Constitution and will not be left unredressed by our
courts.  Nowhere was the role of the United States judiciary as a
bulwark against the tyranny of torture and extreme government
coercion more clearly illustrated than in the case of *Brown v.
Mississippi*, 297 U.S. 278 (1936).

In that case, a deputy sheriff, with the aid of a mob,
tortured several African American defendants into confessing to a
murder that they maintained they did not commit.  After one

-92-

defendant initially proclaimed his innocence to the charges, the
mob, led by the deputy sheriff, went to his house and "hanged him
by a rope to the limb of a tree, and, having let him down, they
hung him again, and when he was let down the second time, and he
still protested his innocence, he was tied to a tree and
whipped." *Brown*, 297 U.S. at 281.  A day or two later, the
deputy and another man returned to the home of the defendant,
whose neck still clearly bore evidence of his recent hangings,
arrested him, and "severely whipped the defendant" until he
finally agreed to "confess to such a statement as the deputy
would dictate" before taking him to jail.  *Id.* at 281–82.

The other two defendants were arrested and taken to the same
jail where they "were made to strip and . . . were laid over
chairs and their backs were cut to pieces with a leather strap
with buckles on it."  *Id.* at 282.  The "whippings progressed and
were repeated" until the defendants "changed or adjusted their
confession in all particulars of detail so as to conform to the
demands of their torturers."  *Id.*  The defendants were later
convicted of the crime to which they were forced to confess and
were sentenced to death.  *Id.* at 284.  Finally, unable to recount
the specifics of the further horrors visited upon the defendants
in securing their confessions, the Court in *Brown* simply stated
that the transcript of the trial read "more like pages torn from
some medieval account than a record made within the confines of a

modern civilization which aspires to an enlightened constitutional government." *Id*.

In overturning those convictions and throwing out the unlawfully obtained confessions, the Supreme Court articulated clearly and authoritatively the role of the courts in protecting the human and legal rights of all those made to confess through acts of torture and extreme coercion. As the Court stated, "[t]he rack and torture chamber may not be substituted for the witness stand." *Id.* at 285-86. Moreover, in a passage that bears repeating, the Court went on to say,

> "[T]he trial equally is a mere pretense where the state authorities have contrived a conviction resting solely upon confessions obtained by violence. The due process clause requires that state action, whether through one agency or another, shall be consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions.
>
> It would be difficult to conceive of methods more revolting to the sense of justice than those taken to procure the confessions of these [defendants], and the use of the confessions thus obtained as the basis for conviction and sentence was a clear denial of due process." *Id.* at 286 (internal citations omitted).

This Court shares the view of the *Brown* Court that torture, and evidence obtained thereby, have no place in the American system of justice (or of any nation for that matter), and the

-94-

Court will continue to clearly and steadfastly assume its duty to
protect the human and legal rights of all who appear before it.

## (2) "Shocks the Conscience"

### Standard of Review

The Supreme Court has consistently held that due process is
violated where government conduct is so egregious that it "shocks
the conscience" and violates the "decencies of civilized
conduct." *County of Sacramento v. Lewis*, 523 U.S. 833, 846
(1998) (quoting *Rochin v. California*, 342 U.S. 165, 172-73
(1952)).   According to the Supreme Court, the due process
guarantees of the Constitution were intended to prevent
government officials "from abusing [their] power, or employing it
as an instrument of oppression."  *Collins v. Harker Heights*, 503
U.S. 115, 126 (1992) (quoting *DeShaney v. Winnebago County Dept.
of Soc. Servs.*, 489 U.S. 189, 196 (1989) (quoting *Davidson v.
Cannon*, 474 U.S. 344, 348 (1986))).  Furthermore, courts have
suggested that the due process "shocks the conscience" standard
can apply to exclude coerced confessions, even when obtained by
agents of a foreign country.  *United States v. Maturo*, 982 F.2d
57, 60-61 (2d Cir. 1992).  Courts have pointed to interrogation
through torture as an example of "shocking" conduct warranting
the exclusion of any resulting statements.  *See, e.g.*, *United
States v. Nagelberg*, 434 F.2d 585, 587 n.1 (2d Cir. 1970)
(suggesting that "rubbing pepper in the eyes" or other shocking

conduct by a foreign officer could warrant the exclusion on due process grounds of any admissions obtained as a result of such conduct).

## **Analysis**

For many of the same reasons that the Court finds the defendant's incriminating statements to have been voluntary, the Court denies the Motion to Suppress because the Court also finds that neither the conduct of U.S. nor Saudi law enforcement officials in the arrest, detention, or interrogation of the defendant "shocks the conscience" and therefore declines to suppress the defendant's incriminating statements.

First, with regard to the Saudis, the defense claims that their use of "such tactics as detention without charges, prolonged solitary confinement, . . . gross physical and psychological abuse, and repeated interrogation to elicit false confessions shocks the conscience" and requires suppression of any incriminating statements.  Def.'s Mem. in Supp. of Mot. to Suppress at 18 (hereinafter "Mot. to Suppress").  As noted, however, while the Court has taken notice of the defendant's allegations of torture, many questions remain as to the credibility and accuracy of those allegations (the Court has just discussed those questions in great detail).

Second, with regard to U.S. law enforcement officials, the defense claims that they secured confessions from the defendant by "calling on their Saudi agents to torture and confine him

without charges for nearly 20 months" and argues that such
conduct similarly shocks the conscience and requires suppression.
*Id.* However, the Court finds no credible evidence that U.S. law
enforcement officials used the Saudis as agents to torture and
confine the defendant or, as noted earlier, that the defendant
was ever actually tortured.  Therefore, the Court does not find
that the conduct of U.S. or Saudi law enforcement officials
"shocks the conscience" and accordingly declines to suppress the
defendant's incriminating statements on this ground.

### (3) "Joint Venture/Saudi Agents/*Miranda*"

#### Standard of Review

It is well established that statements obtained by foreign
police in the absence of a *Miranda* warning are admissible, if
made voluntarily.  *See, e.g.*, *United States v. Yousef*, 327 F.3d
56, 145 (2d Cir. 2003).  However, there are at least two
exceptions to this general rule of admissibility.  First, under
the "joint venture" doctrine, "statements elicited during
overseas interrogation by foreign police in the absence of
*Miranda* warnings must be suppressed whenever United States law
enforcement agents actively participate in questioning conducted
by foreign authorities."  *Id.; see also United States v. Bin
Laden*, 132 F. Supp. 2d 168, 187 (S.D.N.Y. 2001) (citing line of
cases recognizing that a lack of *Miranda* warnings provided by
foreign officials "will still lead to suppression if U.S. law

enforcement themselves actively participated in the questioning"). Second, non-Mirandized statements obtained through interrogations by foreign officials are still subject to suppression when "the conduct of foreign law enforcement officials renders them agents, or virtual agents, of United States officials." *United States v. Karake*, 281 F. Supp. 2d 302, 308 (D.D.C. 2003); *Maturo*, 982 F.2d at 61.

### **Analysis**

The Court denies the Motion to Suppress because the Court finds that: (1) U.S. law enforcement officials did not act in a "joint venture" with Saudi officials in the arrest, detention, or interrogation of the defendant; and (2) Saudi law enforcement officials did not act as agents of U.S. law enforcement officials, and therefore *Miranda* warnings were not required.

The evidence clearly demonstrates that the Saudi government arrested the defendant on June 8, 2003, in Saudi Arabia based on its own information and interest in interrogating the defendant as a suspected member of the al-Faq'asi terrorist cell located in Medina, Saudi Arabia. Gov't's Opp. to Mot. to Suppress at 6 (hereinafter "Gov't's Opp."). The U.S. government did not learn of the defendant's arrest until after it occurred. Furthermore, the defense acknowledges that the FBI was not involved in the interrogations of the defendant that occurred prior to June 15, 2003, in Medina and Riyadh, Saudi Arabia, when virtually all of the incriminating statements sought to be suppressed were made,

Mot. to Suppress at 14, or when the defendant made a handwritten confession and videotaped reading of that confession on July 18 and 24, 2003, respectively.  *Id.*

Concerning the FBI observations in June, the Brigadier General and the Captain, in the Court's view, do not support Mr. Ali's allegations that the June 15, 2003, interrogation statements were the product of a "joint venture" between the United States and Saudi Arabia.  The Court has considered the testimony of FBI Special Agents Jocys, Posto, and language specialist Machanaly concerning their participation in the investigation and the June 15, 2003, interrogation of Mr. Abu Ali.  After consideration of all the evidence, the Court finds that the June 15, 2003, interrogation was not conducted to circumvent Mr. Ali's Fifth Amendment rights under *Miranda v. Arizona*.  384 U.S. 436 (1966).

The evidence is that the Saudi government arrested Mr. Abu Ali in connection with the Riyadh bombing investigation.  Mr. Abu Ali was detained pursuant to a Saudi government order.  The Saudi government was in complete control of Mr. Abu Ali while in custody.  Most importantly, the Saudi government controlled every aspect of the questioning of Mr. Abu Ali on June 15, 2003, and otherwise.  The FBI and Secret Service were permitted to submit a list of questions for the interrogation to the Brigadier General and the Captain.  The FBI and Secret Service were not allowed to determine the content or the form of the questions to be asked during the interrogation.  The Brigadier General determined what

questions would be asked, determined the form of the questions, and set the length of the interrogation.  The Saudi government refused to honor a request to allow the FBI and Secret Service to directly interview Mr. Abu Ali, and the FBI and the Secret Service did not directly question Mr. Abu Ali.

In the end, the June 15, 2003, interrogation was observed through a one-way mirror by FBI and Secret Service agents.  The Court thinks both sides may agree that perhaps six questions submitted by the FBI and Secret Service were modified and used by the Brigadier General and the Captain during the session.  That said, the evidence demonstrates that the Saudis were, at all times, in control of the interrogation and that the FBI never "substantially participated" in the interrogation.  The only direct interrogation of the defendant conducted by U.S. officials was done by the FBI and the Secret Service in September, 2003. And while *Miranda* warnings were not given during that interrogation, the government has indicated that it does not seek to use any statements obtained during that interrogation in its case-in-chief.  Gov't's Opp. at 15 n.8.

The Arresting Officer acknowledged, and the Court acknowledges, that the governments of Saudi Arabia and the United States, including the FBI, cooperate with each other in foreign terrorist investigations.  The U.S. and Saudi governments share intelligence information, conduct investigations of terrorist acts, and from time to time, the Saudi government will return individuals detained in Saudi Arabia to the United States.

The quality of the evidence at this hearing does not show a "joint venture" to arrest and detain Mr. Abu Ali.  The quality of the evidence produced at this hearing does not show that the United States was substantially involved in Mr. Abu Ali's detention or interrogation or that it used the Saudi government as a surrogate to circumvent Mr. Abu Ali's Fifth or Sixth Amendment rights.  The cooperation between Saudi and United States law enforcement and security agencies includes sharing information and periodically rendering suspects or individuals indicted in the United States and is well known.  For example, in the so-called "Virginia Paintball" case, three suspects who were indicted in this Court were arrested by Saudi officials, turned over to the United States, and flown back here for trial.  *See United States v. Khan*, 309 F. Supp. 2d 789, 797 (E.D. Va. 2004).

Therefore, the Court denies the Motion to Suppress because it finds that U.S. and Saudi officials did not act in a "joint venture" and that Saudi officials did not act as "agents" of the United States in the arrest, detention, or interrogation of the Mr. Abu Ali.

**(4) "Search of Dorm Room in Medina, Saudi Arabia"**

**Standard of Review**

"The Fourth Amendment and its exclusionary rule do not apply to the law enforcement activities of foreign authorities acting

in their own country." *United States v. Busic*, 592 F.2d 13, 23
(2d Cir. 1978) (citing *Mapp v. Ohio*, 367 U.S. 643 (1961)).

### Analysis

The Court denies the Motion to Suppress because the Court
finds that Saudi law enforcement officials did not act in a
"joint venture" with U.S. law enforcement officials when
conducting its search of the defendant's dorm room in Medina,
Saudi Arabia, and therefore that the Fourth Amendment is
inapplicable to that search.

### (5) "Search of Home in Falls Church, Virginia"

### Standard of Review

It is well-established that in order for a search warrant to
be valid under the Fourth Amendment, it must, among other things,
"particularly describ[e] the place to be searched, and the
persons or things to be seized." *United States v. Robinson*, 275
F.3d 371, 381 (4th Cir. 2001) (quoting U.S. Const. amend. IV).

### Analysis

The Court denies the Motion to Suppress because it finds no
evidence that the warrant underlying the search of the
defendant's home was unlawful or lacked probable cause.  The
defense has put forth no evidence calling into question the
validity of the search warrant executed on the defendant's home,

save their contention that the warrant was based on the "unlawful interrogation" of the defendant.  This claim must fail because the Court has already ruled that the interrogations of the defendant were lawful and the statements resulting therefrom were voluntary and not the product of torture.  For the foregoing reasons, the Court denies the Motion to Suppress concerning the search of the defendant's home in Falls Church, Virginia.

**Motion to Dismiss**

**(6)"Shocks the Conscience" as to Detention and Interrogation**
**Standard of Review**

The Supreme Court has consistently held that due process is offended when government conduct is so egregious that it "shocks the conscience" and violates the "decencies of civilized conduct." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Rochin v. California*, 342 U.S. 165, 172-73 (1952)).  According to the Supreme Court, the due process guarantees of the Constitution were intended to prevent government officials "from abusing [their] power, or employing it as an instrument of oppression." *Collins v. Harker Heights*, 503 U.S. 115, 126 (1992) (quoting *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 196 (1989) (quoting *Davidson v. Cannon*, 474 U.S. 344, 348 (1986))).  Furthermore, the Supreme Court has recognized that in certain, rare cases, "the conduct of law enforcement agents" may be "so outrageous that due process

principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32 (1973).

**Analysis**

For many of the same reasons that the Court finds the defendant's incriminating statements to have been voluntary, the Court denies the Motion to Dismiss because the Court also finds that the neither conduct of U.S. nor Saudi law enforcement officials in the arrest, detention, or interrogation of the defendant "shocks the conscience" and therefore declines to divest itself of jurisdiction and dismiss the Indictment.

**(7) "Speedy Trial Act"**

**Standard of Review**

The Speedy Trial Act, 18 U.S.C. § 3161(b), states, in relevant part:

Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons *in connection with such charges*. 18 U.S.C. § 3161(b) (2000) (emphasis added).

Therefore, by the plain language of the statute, the so-called 30-day clock of the Speedy Trial Act does not begin to run unless and until a defendant is arrested or summoned *in connection* with a charge covered by the Act, namely, a federal charge.  *Id.; see also United States v. Lee*, 818 F.2d 302, 305 (4th Cir. 1987) ("[S]ection 3161(b) requires . . . a federal arrest upon a federal charge.").

**Analysis**

The Court denies the Motion to Dismiss because the government complied with the Speedy Trial Act since the criminal Indictment against the defendant was filed prior to his being taken into federal custody on federal charges, and therefore was filed within thirty (30) days of his arrest on federal charges as required by the statute.  Federal charges were first filed against the defendant on February 3, 2005, when a grand jury returned a criminal indictment.  The defendant was taken into federal custody in connection with those charges on February 21, 2005.  Therefore, the Indictment was filed within thirty (30) days of the defendant's arrest on federal charges and so met the requirements of the Speedy Trial Act.

The defense argues that the Speedy Trial Act was triggered on three separate occasions.  First, they claim it was "triggered on June 8, 2003, when [the defendant] was arrested in Saudi Arabia at the behest of the United States."  Def.'s Mot. to Dismiss at 19-20 (hereinafter "Mot. to Dismiss").  This claim

must fail because, as the Court has found, the Saudis arrested the defendant for their own purposes and did not act in a "joint venture" with, or as agents of, U.S. law enforcement officials.

Second, the defense claims the statute was triggered by "June 15, 2003, when it is clear that a joint-venture to interrogate and detain him existed between the Saudis and the United States." *Id.* at 20. Again, the Court has found, based on the evidence, that no "joint venture" existed between the U.S. and the Saudis with respect to the defendant's arrest, detention, or interrogation at this or any other juncture, and so this claim must fail.

Third, the defense argues that a May 10, 2004, U.S. State Department cable reporting a Saudi Colonel's statement that "Abu Ali could be rendered to American authorities at any time if the USG [U.S. Government] made a formal request" is evidence that the defendant was being held as of that date "at the request" of the United States. Mot. to Dismiss at 22. This claim also must fail both because it evinces little more than routine prosecutorial cooperation between two sovereigns and because of other evidence that the Court has considered in which U.S. officials specifically and expressly request that the defendant not be held for purposes of the U.S. government. For the foregoing reasons, the Court denies the Motion to Dismiss.

(8) "Sixth Amendment Right to Speedy Trial"

**Standard of Review**

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy public trial . . . ." U.S. CONST. amend. VI.  As with the Speedy Trial Act, the Sixth Amendment right to a speedy trial does not attach until the defendant has been indicted or arrested.  *See Doggett v. United States*, 505 U.S. 647, 655 (1992); *United States v. Thomas*, 55 F.3d 144, 148 (4th Cir. 1995).  Based on a plain reading of the Amendment, the Sixth Amendment right to speedy trial "attaches only when a formal criminal charge is instituted and a criminal prosecution begins."  *United States v. MacDonald*, 456 U.S. 1, 6 (1982).  Likewise, an arrest or indictment by one sovereign does not trigger the speedy trial guarantee of the Sixth Amendment with relation to subsequent indictments by another sovereign.  *See MacDonald*, 456 U.S. at 10 n.11.

**Analysis**

The Court denies the Motion to Dismiss because the Sixth Amendment right to speedy trial does not attach until the defendant has been indicted or arrested, and the defendant has not been prejudiced by any pretrial delay since the time of his indictment on federal charges on February 3, 2005, and his subsequent arrest on February 21, 2005.

**(9) "Prosecutorial Vindictiveness"**

**Standard of Review**

In order to establish prosecutorial vindictiveness, "a defendant must show, through objective evidence, that:  (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus." *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001). Also, the defendant must demonstrate that the charges were brought solely to penalize him, and could not have been justified as a proper exercise of prosecutorial discretion. *See United States v. Goodwin*, 457 U.S. 368, 372, 380 n.12 (1982).

If the defendant is unable to prove that the prosecution was vindictive using direct evidence, he may present other evidence to establish a "presumption of vindictiveness" to demonstrate that the circumstances of the prosecution "pose a realistic likelihood of vindictiveness." *Wilson*, 262 F.3d at 314 (quoting *Blackledge v. Perry*, 417 U.S. 21, 27 (1974) (internal quotations omitted)).  However, because prosecutors are given such broad discretion in charging decisions, such a presumption of vindictiveness will rarely, if ever, be applied to a prosecutor's pre-trial decisions.  *Id.* at 315 (citing *Goodwin*, 457 U.S. at 381).  The evidentiary threshold that a defendant must reach to overcome the presumption of prosecutorial regularity, and thus to establish a presumption of vindictive prosecution, is significant.  *Id.*

**<u>Analysis</u>**

The Court denies the Motion to Dismiss because the current prosecution is within the prosecutorial discretion of the government and because the defendant has not advanced sufficient evidence to establish prosecutorial vindictiveness on the part of the government.

The defendant argues that the current prosecution against him was motivated by his parents' filing of a habeas petition on his behalf in the United States District Court for the District of Columbia.  The defense maintains that because that Court issued a discovery order adverse to the government in December 2004, and the grand jury returned its indictment in the present case in early February 2005, the prosecution was presumptively vindictive.

As noted, federal prosecutors have broad discretion in charging and other pretrial decisions to which a presumption of vindictiveness will rarely, if ever, be applied.  After having considered the defendant's arguments on this point and in light of the high evidentiary threshold faced by the defendant, the Court finds that the current prosecution is not presumptively vindictive and denies the Motion to Dismiss.

### III. CONCLUSION

At the end of the day, the judgment the Court has to make as a fact finder is to determine the credibility and the quality of the evidence concerning a fact in dispute.  The critical inquiry is whether the government has come forward with sufficient evidence to show by a preponderance of the evidence that the statements allegedly obtained from Mr. Abu Ali were voluntary. The Court finds that the government has met its burden of proof to offer these statements into evidence because the Court finds the statements to be voluntary.

The Court has considered the testimony of Saudi government officials including the Arresting Officer, the Warden, the Brigadier General, and the Captain.  In making this judgment, the Court is mindful that there have been news reports accusing the Saudi government of engaging in and condoning torture or human rights violations.  Whatever those reports may be, the Court had an opportunity to observe the witnesses and to weigh their credibility in this particular case.  The testimony concerning Mr. Abu Ali's arrest and initial detention sound like proper arrest procedures, and there is no credible evidence that he was beaten or mutilated.  The Court is very familiar with unlawful police abuse of suspects and with police officers who abuse power.  However, the evidence in this case does not support a judgment that the behavior of the Saudi government officials "shocks the conscience" or that their testimony lacks sufficient credibility to be submitted to a jury.  The Court is not

pronouncing these witnesses to be truthful.  Rather, the Court is making a judgment that, in weighing the issue of the voluntariness of Mr. Abu Ali's statements, the testimony of these witnesses must be considered by the jury.

The Court finds that the government has demonstrated by a "preponderance of the evidence" that any incriminating statements allegedly made by the defendant were "voluntary" and not the result of "gross abuse" or "inherently coercive conditions" and therefore that the statements are admissible evidence for trial. The Court finds that the incriminating statements allegedly made by the defendant were voluntary based on the "totality of the circumstances" after:  having held a full 5-day pretrial suppression hearing outside the presence of a jury; having heard eight (8) days of Rule 15 foreign witness deposition testimony; having heard four (4) days of in-court testimony; and having thoroughly considered the written submissions and arguments of the government and defense counsel.

The Court has taken notice of the defendant's allegations of torture and, if it could fully credit the defendant's testimony, the Court would find that the defendant was, in fact tortured, and would rule that the resulting statements were involuntary. However, the Court heard a great deal of evidence during the suppression hearing and was able to judge the credibility of the witnesses who testified therein, including the defendant Mr. Abu Ali, and many questions remain about the defendant's allegations of torture.  As previously stated, the Court takes very seriously

its duty and responsibility to ensure that statements and evidence obtained through torture find no place in the American justice system, and the Court's thorough and meticulous consideration and review of all of the facts presented in the case thus far were conducted in light of that weighty responsibility.

However, the Court's ruling today does not end the matter as it empowers Mr. Abu Ali to present admissible evidence on the issue of the voluntariness of the statements and his claim of torture to the jury as a contested question of fact.  Under Fourth Circuit law concerning federal prosecutions, the issue of voluntariness concerning the incriminating statements will ultimately be submitted for determination by the jury, and the defense and the government are free to argue the issue to the jury at that juncture.  *United States v. Inman*, 352 F.2d 954, 956 (4th Cir. 1965) (prescribing the "Massachusetts Doctrine" for determining the voluntariness of confessions in federal prosecutions in the Fourth Circuit, a rule requiring that the issue of voluntariness ultimately be submitted to a jury); *accord Morris v. Boles*, 386 F.2d 395, 402 (4th Cir. 1967).  In the end, the jury will have to resolve this very perplexing question.

For all of the foregoing reasons, it is hereby

ORDERED that the Defendant Ahmed Omar Abu Ali's Motion to Suppress is DENIED.  It is further

ORDERED that the Defendant Ahmed Omar Abu Ali's Motion to Dismiss is DENIED.


The Clerk is directed to forward a copy of this Order to counsel of record.

ENTERED this ___25th____ day of October, 2005.

/s/
_____
Gerald Bruce Lee
United States District Judge

Alexandria, Virginia
10/25/05