# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES ) | |
| ) | |
| v. ) | Case No. 05-cr-00053 |
| ) | |
| AHMED OMAR ABU ALI ) | |

## MOTION TO VACATE SENTENCE PURSUANT TO 28 U.S.C. § 2255

Ahmed Abu Ali, through his undersigned counsel, respectfully moves this Court to vacate, set aside or correct his conviction and sentence pursuant to 28 U.S.C. § 2255. This motion is based on new evidence stemming from the Saudi government's cover-up of the torture and murder of Jamal Khashoggi. That torture and killing centrally involved the same secret police agency that, in Mr. Abu Ali's criminal trial, denied torturing him during his detention in Saudi Arabia and extracted a confession that later served as the basis for his prosecution and conviction in the United States. The evidence reveals that the relevant Saudi agency and its overseers engaged in a deliberate scheme to destroy evidence and obstruct international investigations into the torture and killing, and it shows a brazen willingness to cover-up their wrongdoing even in the face of the most intense outside scrutiny – indeed, a de facto state policy to deceive foreign actors.

The tenacity of Saudi officials' efforts to deny any crime until they were forced to make concessions shows they would have no compunction about engaging in similar deception about Mr. Abu Ali's torture, publicly and at trial – as they did, with the knowledge and acquiescence of U.S. government prosecutors intent on obtaining Mr. Abu Ali's conviction at all costs. The

evidence reveals fraud by the Saudi government, and supports a claim for the use of false evidence by the U.S government, and a material withholding of evidence, that could not have been discovered by defense counsel at trial, given what the Khashoggi murder now makes plain: the Saudi government will go to any lengths to cover up wrongdoing. The fraud now revealed shows that Saudi actors – with the knowledge and unfortunate assent of U.S. officials – subverted the administration of justice by this Court and violated Mr. Abu Ali's constitutional rights.

Mr. Abu Ali seeks an evidentiary hearing on all disputed issues of fact and respectfully reserves the right to amend this Motion. He also requests transfer of his Motion to the Court of Appeals for the Fourth Circuit if the district court determines that his Motion is "second or successive" and requires pre-authorization from the Circuit Court pursuant to 28 U.S.C. 2255(h).

In support of his Motion, Mr. Abu Ali states the following:

## I. PROCEDURAL HISTORY

1. Mr. Abu Ali seeks to vacate the amended judgment of July 27, 2009 of the District Court for the Eastern District of Virginia, Alexandria Division, after a plea of not guilty and a trial by jury. The district court initially sentenced Mr. Abu Ali to a term of 360 months, to be followed by the same term of supervised release.

2. Mr. Abu Ali was convicted of the following nine counts: Conspiracy to Provide Material Support to Al Qaeda (18 U.S.C. § 2339B); Providing Material Support to Al Qaeda (18 U.S.C. § 2339B); Conspiracy to Provide Material Support to Terrorists (18 U.S.C. § 2339A); Providing Material Support to Terrorists (18 U.S.C. § 2339A); Contribution of Services to Al Qaeda (50 U.S.C. § 1705(b)); Receipt of Funds and Services from Al Qaeda (50 U.S.C. § 1705(b)); Conspiracy to Assassinate the President (18 U.S.C. § 1751); Conspiracy to Commit

Aircraft Piracy (49 U.S.C. § 46502(a)(2)); and Conspiracy to Destroy Aircraft (18 U.S.C. § 32(b)(4)).

3. Mr. Abu Ali appealed his conviction to the Court of Appeals for the Fourth Circuit. COA Dkt. No. 06-4334. The government cross-appealed the sentence. The court affirmed the conviction, but vacated the sentence and remanded for resentencing on June 6, 2008. *U.S. v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008). Mr. Abu Ali petitioned for rehearing and rehearing en banc, challenging (1) the panel's conclusion that the violation of his Sixth Amendment rights was harmless error; and (2) its finding that the district court's sentence was substantively unreasonable. The Circuit Court denied the petition on July 7, 2008. Mr. Abu Ali petitioned for a writ of certiorari on the issue of whether the Court of Appeals erred in concluding that the violation of his Sixth Amendment rights was harmless error. No. 08-464. The Supreme Court denied the petition on February 23, 2009. 129 S.Ct. 1312 (2009).

4. On remand on July 27, 2009, the district court resentenced Mr. Abu Ali to life without parole.

5. Mr. Abu Ali appealed his sentence to this Court. COA Dkt. No. 09-475. On February 1, 2011, the Court affirmed the judgement of the district court. 410 Fed.Appx. 673 (4th Cir. 2011).

6. On April 27, 2012, Mr. Abu Ali filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255 in this Court, claiming constitutional violations of his right to effective assistance of appellate and trial counsel. The motion was denied without hearing on October 28, 2013. Mr. Abu Ali sought to appeal the decision to the Court of Appeals for the Fourth Circuit. COA Dkt. No. 13-7900. The Circuit Court denied a certificate of appealability and dismissed the appeal on October 7, 2014. Mr. Abu Ali has not filed any further actions until now.

## II. NEW FACTUAL BASIS FOR THIS MOTION

7. On October 2, 2018, Jamal Khashoggi was brutally murdered in the Saudi consulate by a 15-member team of Saudi state agents, including members of Saudi Arabia's secret police agency, the "Mabahith."

8. The Saudi government immediately disclaimed knowledge of Mr. Khashoggi's whereabouts. In a statement to the Associated Press on October 3, the government stated that he had exited the Consulate shortly after his visit, and that the government "follows up diligently on any reports related to the safety of any of its citizens and will continue to follow up on these reports." Associated Press, *Prominent Saudi journalist goes missing during visit to consulate in Turkey*, Oct. 3, 2018, https://www.latimes.com/world/la-fg-saudi-journalist-20181003-story.html.

9. A few days later, the Consul General gave Reuters' journalists a tour of the Consulate to "confirm that ... Jamal is not at the consulate nor in the Kingdom of Saudi Arabia, and the consulate and the embassy are working to search for him." Dominic Evans, *Saudi Arabia opens up consulate after journalist vanishes*, Reuters, Oct. 6, 2018, https://www.reuters.com/article/us-saudi-politics-dissident-consulate/saudi-arabia-opens-up-consulate-after-journalist-vanishes-idUSKCN1MG0RC. The Consul General told the journalists that although "the consulate was equipped with cameras … they did not record footage" the day Mr. Khashoggi disappeared. *Id*.

10. On October 6, Turkish intelligence made public their initial assessment that Mr. Khashoggi had been killed in pre-meditated fashion in the consulate, and that his body had subsequently been moved out of the building. U.N. Human Rights Council, *Annex to the Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions: Investigation into*

4

*the unlawful death of Mr. Jamal Khashoggi*, U.N. DOC. A/HRC/41/CRP.1, ¶ 114 (June 19, 2019) ("UN Special Rapporteur Report"). The Saudi Press Agency issued a statement from an unnamed Saudi official who "strongly denounced these baseless allegations" and stressed that "relevant authorities in the Kingdom are diligently following up on this matter to uncover the complete facts." Saudi Press Agency, *Official at Saudi consulate in Istanbul dismisses report that Saudi citizen Jamal Khashoggi was killed in consulate in Istanbul*, Oct. 7, 2018, https://www.spa.gov.sa/viewfullstory.php?lang=en&newsid=1823102.

11. Beginning on October 6, the government began dispatching a team of 17 Mabahith officials to Istanbul for the official purpose of investigating the disappearance. UN Special Rapporteur Report, ¶¶ 119, 125-126, 287. These Mabahith officials were in the consulate from October 6 to 15, before the first outside investigators were allowed access to the premises. *Id*. ¶ 288.

12. During this period, the Mabahith officials in the consulate were "engaging in … activities which, whatever else they might have accomplished, resulted in a cleaning up of the crime scenes." *Id*. ¶ 283.

13. On October 15, Turkish investigators were finally allowed access to the Consulate, a full two weeks after the murder. *Id*. ¶ 291. According to Turkish officials, the only reason they were finally given access was because they were relentless in their demand: "We had to push and push to be allowed in …." *Id*.

14. During their search of the premises, the investigators found no traces of blood or DNA in the area where Mr. Khashoggi was dismembered. *Id*. ¶ 138. They found evidence of possible re-carpeting and re-painting. *Id*. ¶ 290. They also found evidence that a professional cleaning company had been called to the premises before the Turkish investigators arrived. *Id*.

15. During their search, Turkish investigators reported that Saudi Mabahith officials shadowed them and sharply limited their time on the premises. *Id*. ¶¶ 291, 293. They obstructed their efforts to search the Consul General's Residence where there is evidence the body was taken. *Id*. ¶ 139. They also resisted their efforts to search consular vehicles which there is evidence were used in transporting the remains. *Id*. ¶ 143.

16. "Along with evidence of professional, thorough, if not forensic cleaning of the crime scenes, [Saudi officials] prevented an effective and thorough Turkish investigation and amount to obstruction." *Id*. ¶ 293.

17. During the period of the clean-up of the crime scenes by Mabahith officials, high-level Saudi officials continued to insist that Mr. Khashoggi had left the consulate on October 2. Multiple named and unnamed officials responded to press reports that Mr. Khashoggi had been killed as "baseless" and "absolutely false." The Minister of the Interior denounced "false accusations circulated in some media" and stated that the claims of a killing were "lies and baseless allegations against the government." Saudi Press Agency, Interior Minister Confirms KSA's Condemnation of Some Media's False Accusations Against Kingdom Against Background of Disappearance of Citizen Jamal Khashoggi, Oct. 12, 2018, https://www.spa.gov.sa/1827596.

18. On October 19, only after unprecedented pressure to disclose what happened to Mr. Khashoggi, the Saudi government conceded that Mr. Khashoggi had been killed. Officials claimed that he had died as the result of a fistfight that broke out between him and suspects in the Consulate. UN Special Rapporteur Report, ¶ 146. The Saudi Foreign Ministry issued a statement from the government's chief public prosecutor that the disappearance "drew the attention of Saudi Arabia at the highest levels" and accordingly the authorities "took the

necessary procedures to clarify the truth and immediately dispatched an investigation team to Turkey ….." Hamdi Alkhshali, *Saudi Arabia's full statement on the death of journalist Jamal Khashoggi*, CNN, Oct. 19, 2018, https://www.cnn.com/2018/10/19/middleeast/saudi-arabia-khashoggi-statement/index.html.

19. The Saudi government has by now conceded that the killing was pre-meditated, but implausibly maintains that it was the result of an operation by "rogue" agents. UN Special Rapporteur Report, ¶ 295. The Saudi Foreign Minister explained on Fox News, "Even the senior leadership for the intelligence services was not aware of this. This was a rogue operation. This was an operation where individuals ended up exceeding the authorities and responsibilities they had. They made a mistake when they killed Khashoggi in the consulate and they tried to cover up for it." "Khashoggi's death was a 'rogue operation' that the crown prince was not aware of, Saudi foreign minister says," Washington Post, Oct. 21, 2018, https://outline.com/AXHkLJ.

20. The Saudi government continues to deny that high-level officials were responsible.

21. There have been multiple, rigorous outside investigations and assessments into Mr. Khashoggi's death – including by the CIA, the U.S. Senate, the Turkish government, and the United Nations Special Rapporteur on Extra-Judicial Killing. All have concluded that high-level officials were responsible for planning, overseeing and/or endorsing the murder. *See* UN Special Rapporteur Report (concluding that multiple high-level officers planned, supervised and/or endorsed the mission).

22. In the face of all of these professional assessments, Saudi officials maintain that they are each "absolutely false" and "baseless."

23. Saudi officials have yet to disclose the whereabouts of Mr. Khashoggi's remains. *Id.* ¶ 296.

24. On information and belief, the Saudi government's response to the murder amounted to a de facto state policy to deceive outside actors, involving multiple high-level authorities in the government.

25. The Mabahith played a central role in enabling this deception by destroying and concealing evidence and obstructing international investigations that might lead to criminal liability, on information and belief, under the leadership or endorsement of the Director of the agency.

26. On information and belief, the Director of the Mabahith during and after the Khashoggi murder was at least a high-level official in the agency during the time of Mr. Abu Ali's detention and interrogation by the Mabahith in Saudi Arabia, and during the time of his criminal proceedings in the United States.

27. On information and belief, Mabahith officials were selected for the Khashoggi operation on the basis of their prior experience and training as part of the agency that was relevant and useful for the operation.

### III. RELEVANT FACTS IN MR. ABU ALI'S CRIMINAL CASE

**Mr. Abu Ali's Tortured Confession at the Behest of Saudi Officials**

28. Mr. Abu Ali was held by the Mabahith in two Saudi prisons without charge for close to two years prior to his transfer to the United States for prosecution.

29. A 21-year-old university student at the time, Mr. Abu Ali was tortured by the Mabahith during interrogations that led to a false confession to involvement in an Al Qaeda cell in Medina. Mabahith officials punched him in the stomach, handcuffed him to the floor in a

stress position, whipped him on his back, and threatened him with amputation or beheading. *U.S. v. Abu Ali*, 395 F.Supp.2d 338, 367-69 (2005). After 40 straight days of interrogation, Mabahith officials produced a written summary of his statements and ordered him to hand-copy and sign it. They then directed him to read it aloud while they videotaped him.

30. The FBI had knowledge of Mr. Abu Ali's reports of torture. During an FBI interrogation of Mr. Abu Ali in Riyadh, the agents reported that Mr. Abu Ali told them that "he wrote a lot of things that weren't true, because he said the Saudis used torture techniques." *U.S. v. Abu Ali*, 395 F.Supp.2d at 355. Nevertheless, U.S. prosecutors pursued charges against Mr. Abu Ali, relying on a confession they knew or should have known Mr. Abu Ali credibly claimed was a product of torture.

31. Indeed, Mr. Abu Ali's "confession" served as the primary basis for his criminal charges. "Undoubtedly, Abu Ali's own repeated confessions provide[d] the strongest evidence of his guilt." *U.S. v. Abu Ali*, 528 F.3d 210, 235 (2008) (D.C. Cir.); *see also* Transcript, Jury Trial, Nov. 15, 2005, at 274 (Dkt. No. 364) (the government stating in closing at trial, "We've never taken a position that the confession evidence is not central to this case. Of course it's central. That's why we've gone to such enormous lengths with the Saudi government to obtain as much evidence as possible with respect to what those statements were ….").

32. Testimony by Mabahith officials who supervised and participated in Mr. Abu Ali's detention and interrogation in Saudi Arabia was crucial to the U.S. government's efforts to prove that his confession was voluntary.

**The Saudi Cover-Up of their Torture**

33. The Saudi government would not permit in-person testimony by these Mabahith officials in the U.S. proceedings, or for the officials to testify under their true names. Ultimately,

9

over Mr. Abu Ali's objection, they were deposed under pseudonyms from Riyadh through a live video link to the district courthouse.

34. The testimony of three officials was critical: the Lieutenant Colonel-Warden of the detention center in Medina where Mr. Abu Ali was initially held; the Brigadier General of the al-Ha'ir prison in Riyadh where Mr. Abu Ali was transferred; and the Captain of the al-Ha'ir prison. The Brigadier General and the Captain were Mr. Abu Ali's primary interrogators in al-Ha'ir.

35. The Lieutenant Colonel-Warden adamantly denied that Mr. Abu Ali was questioned or abused in the Medina facility. *U.S. v. Abu Ali*, 395 F.Supp.2d at 345. He stated that the government has a policy against torture and physical abuse of prisoners or suspects, and that the policy is enforced. *Id*. He testified that "not once" had he authorized physical force against a prisoner or had an officer or guard use physical force against a prisoner. Petr's' Mem. of Law in Support of Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255, at 7 (Dkt. No. 444). He asserted that Mr. Abu Ali had been "treated humanely similar to any other prisoner," and that he and all prisoners in Mabahith custody were treated "better than children." *Id*. at 8. He testified that there were no tapes of Abu Ali's time in the prison, despite cameras in each cell, because tapes are routinely recorded over. *U.S. v. Abu Ali*, 395 F.Supp.2d at 345.

36. The Brigadier General and the Captain both "adamantly denied that they directed, participated in, or were aware of any government official torturing Abu Ali or engaging in any such behavior." *U.S. v. Abu Ali*, 395 F.Supp.2d at 346. In response to a question about Mabahith policy on the use of physical force in interrogations, the General replied that "violence is forbidden." Petr's' Mem. of Law in Support of Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255, at 8. The Captain testified that he had only heard of one incident of prisoner

10

mistreatment in his entire tenure with the Mabahith. *Id*. He had "never" heard of any other mistreatment of prisoners by Mabahith officers. *Id*. In his seven years as an interrogator, every person he questioned confessed or gave a statement. *U.S. v. Abu Ali*, 395 F.Supp.2d at 347.

37. No other witnesses presented by the government to prove the voluntariness of the confession had personal knowledge of the circumstances of Mr. Abu Ali's detention or interrogations during the period leading to his confession. No government witnesses, other than the Mabahith witnesses, had any contact with Mr. Abu Ali during this period outside the presence of watchful Mabahith officials.

38. Mr. Abu Ali's confession was admitted at trial and considered by the jury. The absence of the Mabahith officials' testimony "would, to put it mildly, have greatly hindered efforts to prosecute the defendant, because the circumstances surrounding the confession bore crucially on any jury assessment of its voluntariness." *U.S. v. Abu Ali*, 528 F.3d at 241. "Of critical importance was the testimony of the Brigadier General and the Captain, who presided over the interrogation of Abu Ali." *Id*. at 240.

## IV. TIMELINESS

This Motion is timely. Under Section 2255(f)(4), a motion based on new evidence must be brought within one year of the date on which the facts "could have been discovered through the exercise of due diligence." 28 U.S.C. 2255(f)(4). The factual basis for this motion did not come into existence until after October 2, 2018.

## V. THIS MOTION IS NOT SUCCESSIVE

This petition is properly filed as an original motion under Section 2255 because it is based on facts that had not yet arisen at the time of Mr. Abu Ali's prior motion under Section 2255.[1]

It is axiomatic that "not every numerically second petition is a 'second or successive' petition within the meaning of the AEDPA." *In re Williams*, 444 F.3d 233, 235 (4th Cir. 2006). Instead, even a numerically second petition will survive the AEDPA second-or-successive bar if it is "filed when the claim is first ripe." *Panetti v. Quarterman*, 551 U.S. 930, 947 (2007); *see also United States v. Hairston*, 754 F.3d 258, 263 (4th Cir. 2014). AEDPA thus does not bar "second-in-time petitions based on events that do not occur until a first petition is concluded." *United States v. Buenrostro*, 638 F.3d 720, 725 (9th Cir. 2011) (citing *Panetti*); *see also Hairston*, 754 F.3d at 262 n.4 (quoting *Buenrostro*).

The Fourth Circuit's decision in *Hairston* demonstrates the appropriate application of these principles. There, the petitioner was sentenced based in part on a state court conviction that added a point to his criminal history. 754 F.3d at 259. He subsequently prevailed in a state court action to vacate that conviction, after which he filed a numerically second Section 2255 petition seeking resentencing under the guidelines range that would have applied without his state court conviction. *Id.* Reversing the district court, the Fourth Circuit held that Hairston's petition was not "second or successive." *Id.* at 260. Instead, the Court found that "where … the

---

[1] Mr. Abu Ali requests that the district court transfer this Motion to the Court of Appeals for the Fourth Circuit in the event this Court determines that the Motion is "second or successive" and requires pre-authorization from the Circuit Court pursuant to 28 U.S.C. 2255(h). *See Jones v. Braxton*, 392 F.3d 683, 691 (4th Cir. 2004) (noting that district courts have discretion to transfer habeas petitions to court of appeals for authorization). Nonetheless, in diligently pursuing his rights, Mr. Abu Ali has also filed an application pursuant to 28 U.S.C. § 2244 with the Court of Appeals, along with a motion to hold that application in abeyance while the district court resolves this Motion.

12

facts relied on by the movant … did not exist when the numerically first motion was filed and adjudicated," then "his motion [is] not successive." *Id.* at 261.

That is precisely the case here, where Mr. Abu Ali's motion relies on new facts pertaining to the Saudi government's cover-up of the Khashoggi murder. The murder took place on October 2, 2018, and facts concerning Saudi Arabia's responsibility and cover-up were not reported until after that date, plainly after the resolution of Mr. Abu Ali's initial Section 2255 petition, which was final on October 7, 2014. *See United States v. Ali*, 584 F. App'x 135 (4th Cir. 2014). The murder and its cover-up—which, as described below, give rise to claims that Mr. Abu Ali's conviction was obtained only as a result of fraud on the Court—are therefore facts that "did not exist when the numerically first motion was filed and adjudicated." *See Hairston*, 754 F.3d at 261. Mr. Abu Ali's petition is accordingly not barred as "second or successive." *See id.*; *Ramos v. United States*, 321 F. Supp. 3d 661, 666 (E.D. Va. 2018) (finding petition not second or successive where petitioner was "relying on facts that did not exist at the time his first motion was filed and adjudicated"); *Miller v. United States*, No. 6:17-cv-00805-JMC, 2018 WL 2940827, at *2 (D.S.C. June 12, 2018) (finding habeas petition based on breach of plea agreement not successive where plea agreement was breached after adjudication of first habeas petition).[2]

## VI. CLAIMS FOR RELIEF

---

[2] Mr. Abu Ali's petition is thus distinguishable from run-of-the-mill cases involving facts that *existed* at the time of the initial Section 2255 petition, even if they were not discovered until later. *See, e.g.*, *United States v. Hayes*, 352 F. Supp. 3d 629, 637 (W.D. Va. 2019) (dismissing petition as successive because "the factual predicate underlying" the claim "accrued before Hayes filed his first Section 2255 motion in 2010, even though Hayes was unaware of it"). This is not a case where Mr. Abu Ali was merely unaware of relevant facts at the time of his original petition; rather, the relevant facts "*did not exist*" at that time. *See Hairston*, 754 F.3d at 261 (emphasis added).

13

The new evidence is direct proof of the role of the Mabahith in eliminating evidence and obstructing investigations to enable official Saudi deniability of the Khashoggi murder, and a broader demonstration of the willingness and tenacity of Saudi authorities to cover-up and deny wrongdoing in the face of outside scrutiny. It gives rise to three claims not raised by Mr. Abu Ali in his prior proceedings: (i) that the Saudi government, through the testimony of its Mabahith officials in Mr. Abu Ali's criminal proceedings, committed deliberate and material fraud on the court when the officials claimed that Mr. Abu Ali had not been tortured into giving a confession; and that this fraud fundamentally tainted the prosecution and violated Mr. Abu Ali's constitutional rights under (ii) *Napue v. People of the State of Ill.*, 360 U.S. 264 (1959); and (iii) *Brady v. Maryland*, 373 U.S. 83 (1963).

Mr. Abu Ali is thus entitled to relief under Section 2255 because his conviction and sentence were imposed in violation of the Constitution or laws of the United States, and are otherwise subject to collateral attack, 28 U.S.C. 2255(a), because "the alleged error constituted a fundamental defect which inherently result[ed] in a complete miscarriage of justice." *Siddiqi v. United States*, 98 F.3d 1427, 1438 (2d Cir. 1996) (quoting *Reed v. Farley,* 512 U.S. 339, 354, (1994) (internal quotation marks omitted).

> A. **THE SAUDI GOVERNMENT PERPETRATED A FRAUD UPON THE COURT WHEN IT SUBVERTED THE DISTRICT COURT'S TRIAL OF MR. ABU ALI BY INJECTING FALSE TESTIMONY UNDER A GOVERNMENT POLICY OF DECEIVING FOREIGN ACTORS.**

Courts have the inherent power to consider fraud upon the court claims. *See Fox ex rel. Fox v Elk Run Coal Co., Inc.*, 793 F.3d 131, 135 (4th Cir. 2014) (discussing *Hazel-Atlas Co. v. Hartford Empire*, 322 U.S. 238, 245-46 (1944)). Accordingly, a petitioner may properly move for relief from judgment after discovery of a fraud upon the court under 28 U.S.C. § 2255. *United States v. Hardy*, 395 Fed.Appx 20, 21 (4th Cir. 2010).

Fraud upon the court is a uniquely insidious, directed attack on the integrity of the judiciary. *See generally Hazel-Atlas Co.*, 322 U.S. at 245-46; *Fox*, 793 F.3d at 136; *United States v. Conrad*, 675 Fed.Appx 263, 264 (4th Cir. 2017). It contemplates a particularly egregious species of fraud that cannot be uncovered by ordinary adversarial process, *see Hazel* 322 U.S. at 246; *Conrad*, 675 Fed.Appx at 265 (quoting *Great Coastal Exp., Inc. v. Int'l Broth. Of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 675 F.2d 1349, 1357 (4th Cir. 1982), and that implicates public interests beyond those of the individual litigants. *Great Coastal Exp., Inc.*, 675 F.2d at 1364.

The fraud here involved a deliberate, coordinated scheme by the Mabahith and other Saudi authorities to give false testimony about the commission of a crime that worked to manipulate the outcome of Mr. Abu Ali's proceedings and was fundamental to this Court's judgement of conviction. *See id*. at 131 (quoting Hazel, 322 U.S. at 245-46) (the fraud was a "deliberately planned and carefully executed scheme" that severely undermined the "integrity of the judicial process"). It went far beyond ordinary perjury or the sort of routine evidentiary disputes that courts have found not to satisfy the standard for fraud on the court. *See Fox*, 739 F.3d at 137 (involving fraud by a witness who failed to disclose probative evidence).

Moreover, this fraud was not discoverable by ordinary adversarial process. As revealed by the Khashoggi murder, Saudi authorities were engaged in a deliberate practice of state deception that could not have been discerned by the trial court and was extraordinary as a form of state policy. The defense could not "have been expected to do more than it did to uncover the fraud." *Fox*, 739 F.3d at 136 (quoting *Hazel*, at 244). The broader public interest is also implicated because the fraud allowed a corrupt foreign state practice to dictate American judicial administration, and a foreign government to torture an American citizen with impunity.

15

### B. THE SAUDI FRAUD WAS SO EGREGIOUS THAT IT FUNDAMENTALLY TAINTED THE PROSECUTION OF MR. ABU ALI AND VIOLATED HIS CONSTITUTIONAL RIGHTS.

The Due Process Clause acts as a procedural safeguard against prosecutorial abuse of material evidence. The fraud perpetrated by the Saudi authorities was of such an egregious nature that it violated Mr. Abu Ali's right to that protection. Specifically, it means that the prosecution knowingly presented and relied upon materially false evidence in violation of *Napue*, and failed to disclose materially exculpatory evidence under *Brady*.

#### 1. The Prosecution Committed a *Napue* Violation When It Allowed the False Saudi Testimony To Enter the Proceedings.

The Due Process clause is a procedural shield for defendants against the threat of convictions obtained by false evidence. *Napue*, 260 U.S. at 269. All convictions premised on such evidence are fundamentally unfair and must be set aside. *United States v. Agurs*, 427 U.S. 97, 103.

The Due Process Clause forbids the knowing use of false, material evidence. *United States v. Chavez*, F.3d 593, 601 (4th Cir. 2018) (citing *Agurs*, 427 U.S. at 103). In the Fourth Circuit, the government's knowledge need only be constructive; if it should have known the evidence was false the government is in violation. *United States v. Kelly*, 35 F.3d 929, 933-34 (4th Cir. 1994) (citing *Agurs*, 427 U.S. at 103); *United States v. Cargill*, 17 Fed.Appx 214, 225 (2001) ("We have never required a defendant to prove that the government deliberately used false testimony.").

The government violated Mr. Abu Ali's due process rights when it relied on false Saudi testimony that it knew or should have known to be false. If the new evidence shows that the Mabahith officials – the government's chief witnesses – were engaged in deliberate, material fraud when they testified that Mr. Abu Ali was not tortured, then their knowledge of the falsity

16

of their testimony must be imputed to the prosecution. Indeed, there was already a basis for the government's knowledge when Mr. Abu Ali told FBI agents during an interrogation in Saudi Arabia that he had been tortured into making statements.

In rare cases, a court may need to determine whether the false evidence could have affected the judgment. *Chavez*, F.3d 593 at 601 (quoting *Agurs*, 427 U.S. at 103) ("a conviction ... must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."). In this case, the exercise is unnecessary; but for the false testimony, there would have been no conviction of Mr. Abu Ali.

### 2. The Prosecution Committed a *Brady* Violation When it Suppressed Evidence that Saudi Arabia Was Engaged in Torture.

*Brady* safeguards defendants from prosecutorial foul play with respect to favorable evidence. 373 U.S. at 87. This doctrine recognizes the "broad duty of disclosure" consistent with the special role the prosecution has in "the search for truth in criminal trials." *Strickler v. Greene* 527 U.S. 263, 281 (1999); *United States v. Bagley*, 473 U.S. 667, 675 n. 6 (1985) (noting that the prosecutor transcends strict adversarial categorization in pursuit of justice). Accordingly, *Brady* prohibits (1) the willful or inadvertent suppression by the state of (2) favorable evidence (3) material to the final verdict. *See Juniper v. Zook*, 876 F.3d 551, 564 (4th Cir. 2017) (quoting *Banks v. Dretke*, 540 U.S. 668, 691 (2004)). Suppressed evidence is any "information [that] had been known to the prosecution but unknown to the defense." *Agurs*, 427 U.S. at 103.

The rule is broad in the scope of evidence to which it applies. See *Kasi v. Angelone*, 300 F.3d 487, 505 (4th Cir. 2002) (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). Specifically, the *Brady* inquiry considers evidence cumulatively and, importantly, imposes on the prosecution

a "duty to learn any of the favorable evidence known to the others acting on the government's behalf in the case[.]" *Id.*

The prosecution violated the first prong of Brady when, with imputed knowledge of the false testimony of its Saudi witnesses, it suppressed evidence of Saudi deception. *Spicer v. Roxbury Correctional Institute*, 194 F.3d 547, 557 (4th Cir. 1999).

The prosecution violated the second prong because the evidence was clearly favorable to the defense. *Zook*, 876 F.3d at 564 (citing *Dretke*, 540 U.S. at 691). Significantly, this includes "undisclosed evidence that the prosecution's case include[d] perjured testimony and that the prosecution knew or should have known, of the perjury." *Agurs*, 427 U.S. at 103; *see also Kyles*, 514 U.S. at 433 n.7; *Bagley*, 473 U.S. at 678–80 n.8.

The suppressed evidence here was also plainly material to the final verdict. *Zook*, 876 F.3d at 567 (citing *Kyles*, 514 U.S. at 435). The Fourth Circuit has clarified that materiality is a reasonableness inquiry concerned with the capacity of the evidence to "undermine confidence in the verdict." *Id*. There need only be a "reasonable probability" that the result at trial would have been different but for the prosecution's foul play. *Zook*, 876 F.3d 567 (quoting *Strickler*, 527 U.S. 289). Here, there would have been no case or conviction but for the suppressed evidence of Saudi deception.

## **PRAYER FOR RELIEF**

For the foregoing reasons, this Court should issue an order vacating Mr. Abu Ali's conviction and sentence, and granting such other and further relief that the Court deems just and proper.

Dated: Alexandria, Virginia
October 2, 2019

                                        Respectfully submitted,

/s/ John Kenneth Zwerling
John Kenneth Zwerling (VA Bar #08201)
The Law Offices of John Kenneth Zwerling, P.C.
114 North Alfred Street Alexandria, Virginia 22314
Tel. 703-684-8000
jz@zwerling.com

*Baher Azmy (motion for admission *pro hac vice* forthcoming)
*Pardiss Kebriaei (motion for admission *pro hac vice* forthcoming)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012